Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RON WILLIAMS, derivatively on behalf of PG&E CORP. and PACIFIC GAS AND ELECTRIC COMPANY,<br><br>        Plaintiff,<br><br>        vs.<br><br>ANTHONY F. EARLEY, JR., JASON P. WELLS, GEISHA J. WILLIAMS, PATRICK M. HOGAN, JULIE M. KANE, DINYAR B. MISTRY, DAVID S. THOMASON, LEWIS CHEW, FRED J. FOWLER, MARYELLEN C. HERRINGER, JEH C. JOHNSON, RICHARD C. KELLY, ROGER H. KIMMEL, RICHARD A. MESERVE, FORREST E. MILLER, ERIC D. MULLINS, ROSENDO G. PARRA, BARBARA L. RAMBO, ANNE SHEN SMITH, NICKOLAS STAVROPOULOS, and BARRY LAWSON WILLIAMS,<br><br>        Defendants,<br><br>        and<br><br>PG&E CORP. and PACIFIC GAS AND ELECTRIC COMPANY,<br><br>        Nominal Defendant. | Case No.: |

<u>**VERIFIED SHAREHOLDER DERIVATIVE AND DOUBLE DERIVATIVE COMPLAINT**</u>

1

Verified Shareholder Derivative and Double Derivative Complaint

**<u>INTRODUCTION</u>**

Plaintiff Ron Williams ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendants PG&E Corp. ("PG&E") and Pacific Gas and Electric Company (the "Utility" and collectively with PG&E, the "Company"), files this Verified Shareholder Derivative and Double Derivative Complaint against Individual Defendants Anthony F. Earley, Jr., Jason P. Wells, Geisha J. Williams, Patrick M. Hogan, Julie M. Kane, Dinyar B. Mistry, David S. Thomason, Lewis Chew, Fred J. Fowler, Maryellen C. Herringer, Jeh C. Johnson, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Eric D. Mullins, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, Nickolas Stavropoulos, and Barry Lawson Williams (collectively, the "Individual Defendants" and together with the Company, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of PG&E, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PG&E, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**<u>NATURE OF THE ACTION</u>**

1.     This is a shareholder derivative and double derivative action that seeks to remedy wrongdoing committed by the Company's directors and officers from April 29, 2015 through the present (the "Relevant Period"), particularly false and misleading statements disseminated to the

public and made in filings with the SEC, causing investors to purchase Company stock at artificially inflated prices and subjecting the Company to a consolidated securities class action pending in this court, captioned *In Re PG&E Corporation Securities Litigation*, No. 3:18-cv-3509-RS (N.D. Cal.).

2.      PG&E is a holding company that operates primarily through the Utility, which is a subsidiary of PG&E.

3.      Through the Utility, PG&E is involved in the sale and delivery of electricity and gas in Northern and Central California. These operations account for the majority of PG&E's revenues.

4.      The derivative claims asserted in this Complaint are the claims of PG&E. The double derivative claims asserted in this Complaint are the claims of the Utility on behalf of its parent, PG&E, which is the Utility's majority shareholder.

5.      Beginning on or about October 8, 2017, a series of wildfires were ignited in California (the "Wildfires"). These Wildfires ultimately burned no less than 240,000 acres of land, resulting in severe property damage and loss of life.

6.      Thereafter, media outlets began reporting, starting on or about October 11, 2017, that authorities in the State of California had begun reviewing whether power lines operated by PG&E and the Utility were the cause of the Wildfires.

7.      On this news, the price per share of PG&E stock steadily declined from a close of $69.19 per share on October 10, 2017 to close at $53.43 per share on October 16, 2017 – a drop of 22.2%, or $15.22.

8.      On December 20, 2017, the Company issued a press release revealing that, as a result of the potential liabilities associated with the Wildfires, it would be suspending its quarterly cash dividend on PG&E's common stock, beginning with the quarter ended December 31, 2017.

Verified Shareholder Derivative and Double Derivative Complaint

9.     On this news, the price per share of PG&E stock fell from a close of $51.12 per share on December 20, 2017 to close at $44.50 per share on December 21, 2017 – a drop of over 12.9%, or $6.62.

10.     On May 25, 2018 the California Department of Forestry and Fire Protection ("CAL FIRE") issued a press release announcing that its investigators had determined that four of the Wildfires were the result of trees coming into contact with power lines. In three of the four investigations, CAL FIRE had found evidence that PG&E had violated state law.

11.     On this news, the price per share of PG&E stock fell from a close of $44.66 per share on May 25, 2018 to close at $42.34 per share on the following trading day, May 29, 2018[1] – a drop of approximately 5.2%, or $2.32.

12.     On June 8, 2018, CAL FIRE issued another press release, announcing that its investigations concluded that another 12 Wildfires "were caused by electric power and distribution lines, conductors and the failure of power poles" owned by PG&E. The press release further revealed that CAL FIRE had referred 8 of those 12 fires to the relevant District Attorney's offices for review.

13.     On this news, the price per share of PG&E stock fell from a close of $41.45 per share on June 8, 2018 to close at $39.76 per share on the following trading day, June 11, 2018 – a drop of approximately 4.1%, or $5.76.

14.     Ultimately, it was determined that PG&E equipment was responsible for 17 of the fires that comprised the Wildfires, and that there existed evidence of violations of state safety regulations in 11 of those fires.

15.     On November 8, 2018, following a threatened, but ultimately unexecuted, safety-based power shutdown, a fire was ignited in Butte County (the "Camp Fire"). Just before that fire began, the

---

[1] Markets were closed on May 28, 2018 in observance of Memorial Day.

Verified Shareholder Derivative and Double Derivative Complaint

Company had informed California regulators that a high-voltage line near the fire's point of origin had an issue.

16.     On November 12, 2018, the California Public Utility Commission ("CPUC") announced it had launched an investigation into PG&E's regulatory compliance related to the Camp Fire.

17.     On this news, the price per share of PG&E stock fell from a close of $39.92 per share on November 9, 2018 to close at $32.98 per share on the following trading day, November 12, 2018 – a drop of approximately 16.5%, or $7.88.

18.     On November 13, 2018 a suit was filed in San Francisco County Superior Court against the Company for damages arising from the Camp Fire. The suit alleges the Company failed to maintain its infrastructure and equipment and had a flawed corporate culture, both of which led to the Camp Fire.

19.     As of November 15, 2018, the Camp Fire was reportedly responsible for over 60 deaths, hundreds of missing persons, and nearly 12,000 structures destroyed.

20.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

21.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to PG&E and the Utility, willfully or recklessly made and/or caused the Company to make false and/or misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company failed to comply with state safety requirements and regulations in maintaining its transmission and distribution networks; (2) as a result of the foregoing, the Company was in violation of such state laws and regulations; (3) the Company had made less progress on safety enhancements, and in particular, wildfire safety enhancements, than

it had represented; (4) the Company did not double its typical vegetation management spending in 2016; (5) the Company's electricity transmission and distribution networks could foreseeably, and ultimately did, cause a number of wildfires in the State of California due, at least in part, to the Company's failures of regulatory compliance; (6) as a result of the Company's safety issues, the Company's dividend was not as secure as the Individual Defendants had led the market to believe; (7) the Company failed to maintain internal controls; and (8) due to the foregoing, Defendants' statements regarding the Company's business, operations, regulatory compliance and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

22.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

23.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

24.     Furthermore, during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, five of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $3.1 million.

25.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected PG&E and its former President and Chief Executive Officer ("CEO"), its current President and CEO, its Chief Ethics and Compliance Officer, the Utility, a former President, Chief Operating Officer ("COO") and board member of the Utility, another former President of the Utility, and the Utility's Senior Vice President of Electric Operations to a consolidated federal securities fraud class action lawsuit pending in this District (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of

Individual Defendants who were improperly over-compensated by the Company and who received proceeds of insider sales.

26.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

27.     In light of (a) the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom serve as the Company's current directors, (b) the collective engagement in fraud and misconduct by the Company's directors, (c) the substantial likelihood of the Company's directors' liability in this derivative action, and (c) the Company's directors not being disinterested and/or independent directors, a majority of the Company's Boards of Directors (the "Boards") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

29.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

30.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

31.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

32.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

Verified Shareholder Derivative and Double Derivative Complaint

33.    Venue is proper in this District because the Company is headquartered in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

34.    Plaintiff is a current shareholder of PG&E. Plaintiff has continuously held PG&E common stock at all relevant times. Plaintiff is a citizen of the State of Florida.

### Nominal Defendant PG&E

35.    PG&E is a California corporation with its principal executive offices at 77 Beale Street, P.O. Box 770000, San Francisco, California 94177. PG&E's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "PCG."

### Nominal Defendant Utility

36.    The Utility is PG&E's primary operating subsidiary. As of March 8, 2018, PG&E owned 100% of the Utility's outstanding common stock and 96.24% of the Utility's outstanding stock.[2] The Utility has issued several classes of preferred stock which trade on the NYSE.

### Defendant Earley

37.    Defendant Anthony F. Earley, Jr. ("Earley") was PG&E's President, CEO, and Chairman of the Board from 2011 until March 1, 2017, after which he served as the PG&E's Executive Chairman of the Board until his retirement from the Company on December 15, 2017. He also served as a director of the Utility from 2012 to December 15, 2017. According to the Company's Schedule 14A filed with the SEC on April 18, 2017 (the "2017 Proxy Statement"), as of March 8, 2017,

---

[2] The Utility's common and preferred stock vote together as a single class, and each share is entitled to one vote. PG&E held no shares of the Utility's preferred stock as of March 1, 2018.

Defendant Earley beneficially owned 294,228 shares of PG&E's common stock. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Earley owned approximately $19.2 million worth of PG&E stock.

38.    For the fiscal year ended December 31, 2017, Defendant Earley received $6,012,329 in compensation from the Company. This included $1,026,363 in salary, $3,000,153 in stock awards, $1,025,835 in non-equity incentive plan compensation, $871,444 in change in pension value and nonqualified deferred compensation earnings, and $88,534 in all other compensation.

39.    The Company's 2017 Proxy Statement stated the following about Defendant Earley:

**Anthony F. Earley, Jr.**[3]

**Age:** 67
**Director Since:** September 2011 (PG&E Corporation); June 2012 (Utility)
**Current Board Committees:** Executive (Chair)
**Current Position:** Executive Chair of the Board of PG&E Corporation
**Other Current Public Company Boards:** Ford Motor Company since 2009 (serves on compensation committee (chair), nominating and governance committee, and sustainability and innovation committee)

**Prior Positions:**

Mr. Earley previously served as Chairman, CEO, and President of PG&E Corporation (September 2011 to February 2017). Prior to joining PG&E Corporation, he was Executive Chairman of DTE Energy Company (integrated energy company) (October 2010 to September 2011), and served as that company's Chairman of the Board and CEO (1998 to 2010) and President and CEO. Before joining DTE Energy Company, Mr. Earley served as President and COO of Long Island Lighting Company (electric and gas utility in New York).

**Prior Public Board Service During the Past Five Years:**

Masco Corporation (home improvement and building products and services) (2001 to 2012)

**Other Board Experience:**

Mr. Earley serves on the executive and compensation committees of the Edison Electric Institute and is former Chairman of that association. In addition, he serves on the

---

[3] Emphasis is in the original unless otherwise noted throughout.

executive committee and compensation committees and as a director of the Electric Power Research Institute and also as a director of the Nuclear Energy Institute. Mr. Earley has served on the boards of numerous charitable and civic organizations, and currently serves on the boards of the Bay Area Council, United Way of the Bay Area, and the Exploratorium.

**Experience, Skills, and Expertise:**

Mr. Earley has extensive knowledge and experience across all aspects of the energy industry, including electric and gas utility operations, nuclear energy, and energy policy and regulation. He brings executive management, business, and civic leadership skills gained from a significant number of years as a CEO and a director of other large public companies.

40.     Upon information and belief, Defendant Earley is a citizen of the State of California.

**Defendant Williams**

41.     Defendant Geisha J. Williams ("Williams") has served as PG&E's President and CEO since March 1, 2017. She has been a director of PG&E since May 2017. She has been a director of the Utility since 2015, and served as the Utility's President, Electric from 2015 to February 2017. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Williams beneficially owned 63,142 shares of PG&E's common stock and common stock equivalents. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Williams owned over $4.1 million worth of PG&E stock.

42.     For the fiscal year ended December 31, 2017, Defendant Williams received $8,597,220 in compensation from the Company. This included $991,667 in salary, $6,500,168 in stock awards, $996,810 in change in pension value and nonqualified deferred compensation earnings, and $108,575 in all other compensation.

43.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Williams made no purchases of PG&E stock, and sold 14,645 shares of PG&E stock on March 4, 2016 at $56.24 per share, from which she benefited in the amount of approximately $823,635.  Her insider sale, made with knowledge

of material non-public information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

44.     The Company's Schedule 14A filed with the SEC on March 26, 2018 (the "2018 Proxy Statement") stated the following about Defendant Williams:

**Geisha J. Williams**

---

**Age:** 56
**Director Since:** May 2017 (PG&E Corporation); August 2015 (Utility)
**Current Board Committees:** Executive
**Current Position:** CEO and President, PG&E Corporation

**Prior Positions:**

Prior to serving as CEO and President of PG&E Corporation, Ms. Williams was the Utility's President, Electric (August 2015 to February 2017) and the Utility's Executive Vice President, Electric Operations (June 2011 to August 2015). In her role as President, Electric, Ms. Williams led all aspects of the Utility's electric business, including power generation, nuclear operations, transmission, distribution, and substation operations, asset management and strategy, and energy procurement, as well as the enterprise-wide customer care organization. She previously served as the Utility's Senior Vice President, Energy Delivery (December 2007 to May 2011). Before joining the Utility, Ms. Williams held officer-level positions leading electric distribution at Florida Power and Light Company (electric utility serving customers in Florida), as well as a variety of positions of increasing responsibility in customer service, marketing, external affairs, and electric operations at that company.

**Other Board Experience:**

Ms. Williams currently serves as a director of the Edison Electric Institute and the Institute of Nuclear Power Operations, as trustee of the University of Miami and the California Academy of Sciences, and as director of the Center for Energy Workforce Development.

**Experience, Skills, and Expertise:**

Ms. Williams brings over 30 years of utility experience, as well as deep knowledge of the Utility's electric operations business. She has extensive executive leadership, business, and management experience in areas such as utility operations, customer service, marketing, safety, strategy and planning, and external and community affairs, gained from her numerous leadership roles at both the Utility and at another large utility.

45.     Upon information and belief, Defendant Williams is a citizen of the State of California.

**Defendant Wells**

46.     Defendant Jason P. Wells ("Wells") has served as PG&E's CFO and senior Vice President since January 2016. Prior to becoming PG&E's CFO, Defendant Wells served the Utility in various roles from 2007 to 2015, including as its Vice President, Business Finance from 2013 to December 2016. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Wells beneficially owned 18,640 shares of PG&E's common stock. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Wells owned over $1.2 million worth of PG&E stock.

47.     For the fiscal year ended December 31, 2017, Defendant Wells received $3,108,134 in compensation from the Company. This included $583,333 in salary, $2,000,079 in stock awards, $462,213 in change in pension value and nonqualified deferred compensation earnings, and $62,509 in all other compensation.

48.     The Company's website states the following about Defendant Wells:[4]

**Jason P. Wells**
Senior Vice President and Chief Financial Officer | PG&E Corporation

Jason P. Wells is Senior Vice President and Chief Financial Officer for PG&E Corporation. Wells oversees the financial activities of the $45 billion company, including accounting, treasury, tax, risk, business and financial planning, and investor relations.

Wells began his career at PricewaterhouseCoopers, LLC, where he was most recently a Senior Manager. In 2007, Wells joined Pacific Gas and Electric Company as the Director of Technical Accounting and was promoted to Senior Director of Corporate Accounting and Assistant Controller in 2008. Wells became Vice President, Finance of Pacific Gas and Electric Company in October 2011 and Vice President, Business Finance in August 2013. He was appointed to his current position in January 2016.

Wells earned his bachelor's and master's degrees in accounting from the University of Florida. Wells is a Certified Public Accountant in the state of Florida.

---

[4] http://www.pgecorp.com/corp/about-us/officers/corporation/jason-wells.page. Last visited October 25, 2018.

49.     Upon information and belief, Defendant Wells is a citizen of the State of California.

**Defendant Hogan**

50.     Defendant Patrick M. Hogan ("Hogan") has served as the Utility's Senior Vice President of Electric Operations since March 2016. Prior to that role, he served as the Utility's Vice President of Electric Operations Asset Management from 2013 to February 2016.

51.     The Company's website states the following about Defendant Hogan:[5]

Patrick M. Hogan is Senior Vice President of Electric Operations at Pacific Gas and Electric Company.

Hogan oversees PG&E's electric system, which delivers safe and reliable energy to more than 16 million people throughout Northern and Central California. In addition to his electric responsibilities, Hogan has enterprise-wide responsibility for PG&E's Transportation Services, managing over 14,000 vehicles and pieces of equipment.

Prior to his current role, Hogan served as Vice President of Electric Strategy & Asset Management where he oversaw the company's electric transmission and distribution assets. Hogan also led the development and deployment of technology into PG&E's electric system.

Before joining PG&E in 2013, Hogan held leadership and officer roles in transmission, distribution, operations, engineering and asset management at British Columbia Hydro, National Grid, and KeySpan.

Originally from New York, Hogan holds a bachelor's and master's degree in electrical engineering from Manhattan College and a master's degree in business administration from Hofstra University. His community involvement includes serving on the board of the San Francisco Ballet.

52.     Upon information and belief, Defendant Hogan is a citizen of the State of California.

**Defendant Kane**

53.     Defendant Julie M. Kane ("Kane") has served as Senior Vice President, Chief Ethics and Compliance Officer, and Deputy General Counsel of PG&E since May 2015. The Company's

---

[5] http://pgecorp.com/corp/about-us/officers/corporation/julie-kane.page. Last visited November 15, 2018.

Verified Shareholder Derivative and Double Derivative Complaint

2015 Corporate Responsibility and Sustainability Report, issued on October 16, 2015, outlines the following duties of the that role, which include overseeing compliance reporting:

> Within senior leadership, ***ethics and compliance are managed by a Chief Ethics and Compliance Officer,*** a position created in 2015 as part of our commitment to achieve a best-in-class ethics and compliance program. The position reports to the PG&E Corporation CEO and has additional reporting responsibility to the Audit Committees of the Board of Directors, and the Compliance and Public Policy Committee of PG&E Corporation. ***The new position is responsible for:***
>
> • ***Building a best-in-class ethics and compliance program and overseeing its implementation,***
>
> • ***Overseeing company-wide programs for compliance reporting and related investigatory processes*** . . .

(Emphasis added.) Subsequent Corporate Responsibility and Sustainability Reports include similar language.

54.     The Company submitted a sentencing memorandum on January 9, 2017 in connection with charges arising from a September 9, 2010 pipeline explosion in San Bruno. That sentencing memorandum set forth Defendant Kane's responsibilities as Chief Ethics and Compliance Officer, stating, in relevant part:

> ***Ms. Kane is responsible for overseeing the Company-wide compliance and ethics program, including compliance management, risk-mitigation and reporting; overseeing employee-investigatory processes; and reinforcing PG&E's ethics and compliance culture***, among many other compliance and ethics program elements. . . . The CECO, Julie Kane, reports directly to PG&E Corporation's Chairman and CEO, and is accountable to PG&E Corporation's and PG&E's Boards of Directors, with additional reporting responsibility to the Compliance and Public Policy Committee of PG&E Corporation's Board and the Audit Committees of PG&E Corporation's and PG&E's Boards.

(Emphasis added.)

55.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Kane made no purchases of PG&E stock, and made the following sales of PG&E stock. She sold 2,233 shares of PG&E stock on August 14, 2017 at $69.98 per share, from which she benefited in the amount of approximately

$156,265. She sold 936 shares of PG&E stock on March 6, 2018 at $41.93 per share, from which she benefited in the amount of approximately $39,246. She sold 489 shares of PG&E stock on June 1, 2018 at $43.33 per share, from which she benefited in the amount of approximately $21,188. Thus, in total, she sold 3,658 shares during the period which PG&E's share price was artificially inflated due to the false and misleading statements alleged herein, for which she received $216,700 in proceeds. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

56.     The Company's website states the following about Defendant Kane:[6]

Julie M. Kane is Senior Vice President and Chief Ethics and Compliance Officer and Deputy General Counsel for PG&E Corporation.

Julie joined PG&E in May 2015 as part of the Company's commitment to achieving a best-in-class ethics and compliance program. She oversees the company-wide compliance program, including the programs and systems designed to prevent, detect, and mitigate non-compliance. She also leads the Company's ethics and compliance training and culture-building efforts. Julie reports directly to the Chairman, Chief Executive Officer, and President of PG&E Corporation and to the Boards of Directors Audit Committees, and the PG&E Corporation Compliance and Public Policy Committee.

Before PG&E, Julie worked at Avon Products, Incorporated as Vice President and General Counsel of Avon North America and Corporate Legal Functions. Prior to her role with Avon, she held a number of senior roles with Novartis Corporation and its affiliates over a 25-year period, culminating in her role as Vice President, Ethics and Compliance for Novartis Corporation. Julie's other Novartis roles included Vice President, Ethics and Compliance and Corporate Citizenship for Novartis Pharmaceuticals Corporation, and Vice President, Health, Safety and Environment and Chief Environmental Counsel for Novartis Corporation.

Julie holds an undergraduate degree in political science from Williams College, Williamstown, Massachusetts, and a law degree from the University of San Francisco School of Law. She is a member of the California state bar.

57.     Upon information and belief, Defendant Kane is a citizen of the State of California.

---

[6] http://pgecorp.com/corp/about-us/officers/corporation/julie-kane.page. Last visited November 15, 2018.

Verified Shareholder Derivative and Double Derivative Complaint

**Defendant Mistry**

58.     Defendant Dinyar B. Mistry ("Mistry") served as PG&E's Vice President and Controller from 2010 to May 2016, and as the Utility's Chief Financial Officer and Controller from 2011 to June 2016. Since March 2016, he has served as PG&E's and the Utility's Senior Vice President of Human Resources, and he has served as PG&E's and the Utility's Chief Diversity Officer since February 2017. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Mistry beneficially owned 14,910 shares of PG&E's common stock. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Mistry owned approximately $1 million worth of PG&E stock.

59.     For the fiscal year ended December 31, 2017, Defendant Mistry received $2,408,823 in compensation from the Company. This included $471,208 in salary, $800,162 in stock awards, $360,644 in non-equity incentive plan compensation, $730,441 in change in pension value and nonqualified deferred compensation earnings, and $46,368 in all other compensation.

60.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Mistry made no purchases of PG&E stock, and sold 5,586 shares of Company stock on March 6, 2018 at $41.93 per share, from which he benefited in the amount of approximately $234,221.  His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

61.     The Company's website states the following about Defendant Mistry:[7]

**Dinyar B. Mistry**
Senior Vice President, Human Resources and Chief Diversity Officer | PG&E Corporation

---

[7] http://www.pgecorp.com/corp/about-us/officers/corporation/dinyar-mistry.page. Last visited October 25, 2018.

Verified Shareholder Derivative and Double Derivative Complaint

Dinyar Mistry is Senior Vice President, Human Resources and Chief Diversity Officer for PG&E Corporation. Mistry is also Senior Vice President, Human Resources and Chief Diversity Officer for Pacific Gas and Electric Company. In this capacity, he oversees PG&E's talent acquisition strategy, employee development, labor relations, and diversity and inclusion programs, among other responsibilities. His expertise in governance, process improvement and controls informs his leadership of PG&E's Human Resources organization.

Mistry joined Pacific Gas and Electric Company in 1994 and has held positions of increasing responsibility in the Finance and Regulation organizations at both the Utility and PG&E Corporation. He has served as Vice President and Controller of Pacific Gas and Electric Company; as Vice President, Regulation and Rates; as Vice President, Internal Audit and Compliance; and most recently as Vice President and Chief Risk and Audit Officer. Prior to his arrival at Pacific Gas and Electric Company, Mistry was a senior manager at KPMG.

In addition to his professional career, Mistry supports economic empowerment and human rights endeavors. He is a board member of First Graduate, a San Francisco-based nonprofit organization dedicated to helping economically disadvantaged high school students become the first in their families to graduate from college.

Mistry holds a Bachelor of Commerce in accounting and financial management from Bombay University, a Master of Business Administration from Texas Christian University and a Master of Science in taxation from Golden Gate University. He is also registered as a Certified Public Accountant in the state of California.

62.     Upon information and belief, Defendant Mistry is a citizen of the State of California.

**<u>Defendant Thomason</u>**

63.     Defendant David S. Thomason ("Thomason") has, since June 1, 2016, served as PG&E's Vice President and Controller and as the Utility's Vice President, CFO, and Controller. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Thomason beneficially owned 4,533 shares of PG&E's common stock. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Thomason owned approximately $295,370 worth of PG&E stock.

64.     For the fiscal year ended December 31, 2017, Defendant Thomason received $941,475 in compensation from the Company. This included $301,650 in salary, $300,086 in stock awards,

$113,482 in non-equity incentive plan compensation, $170,516 in change in pension value and nonqualified deferred compensation earnings, and $55,741 in all other compensation.

65.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Thomason made no purchases of PG&E stock, sold 700 shares of PG&E stock on August 23, 2017 at $69.62 per share, and sold 700 shares of PG&E stock on November 15, 2017 at $56.82 per share. Defendant Thomason benefited from these sales in the amount of approximately $88,508.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

66.     The Company's website states the following about Defendant Thomason:[8]

**David S. Thomason**
Vice President and Controller | PG&E Corporation

Thomason joined PG&E in 2001 as a senior accounting analyst after starting his career with Arthur Andersen in Portland. During his 16 years at PG&E, he has held a multitude of roles, growing as a leader and gaining additional responsibilities with each new position. Functional areas he has overseen include external financial reporting, revenue forecasting, planning and analysis, corporate accounting and more.

Thomason received a Master's degree in Business Administration from University of California, Berkeley, and a Bachelor's degree in Accounting from University of Oregon, Eugene. He holds registrations as a Certified Public Accountant in the states of California and Oregon.

67.     Upon information and belief, Defendant Thomason is a citizen of the State of California.

**Defendant Chew**

68.     Defendant Lewis Chew ("Chew") has served as a PG&E director and Utility director since 2009, and serves as the Chair of the Audit Committee of both Boards and as a member of

---

[8] http://www.pgecorp.com/corp/about-us/officers/corporation/dinyar-mistry.page. Last visited October 25, 2018.

Verified Shareholder Derivative and Double Derivative Complaint

PG&E's Compliance and Public Policy Committee, of which he was the Chair between 2013 to May 2017. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Chew beneficially owned 18,830 shares of PG&E's common stock and common stock equivalents. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Chew owned over $1.2 million worth of PG&E stock.

69. For the fiscal year ended December 31, 2017, Defendant Chew received $293,630 in compensation from the Company, comprised of $153,545 in fees earned or paid in cash, $139,989 in stock awards, and $96 in all other compensation.

70. The Company's 2018 Proxy Statement stated the following about Defendant Chew:

**Lewis Chew**

**Age:** 55
**Director Since:** September 2009
**Current Board Committees:** Audit (Chair); Compliance and Public Policy; Executive
**Current Position:** Executive Vice President and Chief Financial Officer of Dolby Laboratories, Inc. (audio, video, and voice technologies) since June 2012

**Prior Positions:**

Mr. Chew previously was Senior Vice President, Finance and Chief Financial Officer of National Semiconductor Corporation (design, manufacturing, and sale of semiconductor products) (2001 to 2011). Before that, he was a Partner and certified public accountant at KPMG, LLP (accounting firm), where he served mainly technology and financial institution clients.

**Experience, Skills, and Expertise:**

As an executive of a large business customer in the Utility's service area, Mr. Chew brings insights from a customer's perspective to the Boards. He has specific financial expertise and executive management and leadership skills gained from serving as a chief financial officer of other large public companies and as an audit partner at KPMG, LLP. He also has experience managing and overseeing all financial functions at a large public company, as well as information technology, manufacturing and supply chain, global facilities, investor relations, business planning, corporate controllership, strategic planning, business development, worldwide operations finance, and global internal audit functions.

71. Upon information and belief, Defendant Chew is a citizen of the State of California.

**Defendant Fowler**

72.     Defendant Fred J. Fowler ("Fowler") has served as a PG&E director and as a Utility director since 2012, and is a member of both Board's Safety and Nuclear Oversight Committee and PG&E's Finance Committee. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Fowler beneficially owned 9,514 shares of PG&E's common stock. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Fowler owned approximately $619,932 worth of PG&E stock.

73.     For the fiscal year ended December 31, 2017, Defendant Fowler received $277,835 in compensation from the Company, comprised of $137,750 in fees earned or paid in cash, $139,989 in stock awards, and $96 in all other compensation.

74.     The Company's 2018 Proxy Statement stated the following about Defendant Fowler:

**Fred J. Fowler**

**Age:** 72
**Director Since:** March 2012
**Current Board Committees:** Finance; Safety and Nuclear Oversight
**Current Position:** Retired Chairman of the Board, Spectra Energy Partners, LP (master limited partnership that owns natural gas transmission and storage assets)
**Other Current Public Company Boards:** Encana Corporation (natural gas producer) since 2010 (serves on corporate responsibility, environment, health and safety committee, and human resources and compensation committee); DCP Midstream Partners, LP (master limited partnership that owns, operates, acquires, and develops midstream energy assets) since 2015 (serves on audit committee)

**Prior Positions:**

In addition to serving as Chairman of the Board of Spectra Energy Partners, LP (2008 to 2013), Mr. Fowler was President and CEO of Spectra Energy Corp (natural gas gathering and processing, transmission and storage, and distribution company) (2006 to 2008) and served as a director of that company. Before that, he held various executive positions with Duke Energy Corporation (gas and electric energy company) and its subsidiaries and predecessor companies, including President and COO of Duke Energy.

**Prior Public Board Service During the Past Five Years:**

20

Verified Shareholder Derivative and Double Derivative Complaint

Spectra Energy Partners, LP (2008 to 2017)

**Other Board Experience:**

Mr. Fowler is the former Chairman of the Board of the Interstate Natural Gas Association of America and a former director of the Gas Research Institute, the Gas Technology Institute, and the Institute of Nuclear Power Operations.

**Experience, Skills, and Expertise:**

Mr. Fowler brings extensive knowledge and over 45 years of experience in natural gas and gas liquids production, transportation, and marketing, and electricity generation, transmission, distribution, and safety. He brings leadership, management, and business skills developed as an executive and a director of numerous public and privately held companies.

75.     Upon information and belief, Defendant Fowler is a citizen of the State of Texas.

**Defendant Herringer**

76.     Defendant Maryellen C. Herringer ("Herringer") served as a PG&E director and as a Utility director from 2005 to May 30, 2017, and was a member of the Audit Committee of both Boards. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Herringer beneficially owned 61,271 shares of PG&E's common stock and common stock equivalents. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Herringer owned approximately $4 million worth of PG&E stock.

77.     For the fiscal year ended December 31, 2017, Defendant Herringer received $57,099 in compensation from the Company, comprised of $56,003 in fees earned or paid in cash and $96 in all other compensation.

78.     The Company's Schedule 14A filed with the SEC on April 11, 2016 (the "2016 Proxy Statement") stated the following about Defendant Herringer:

**Maryellen C. Herringer**

**Age:** 72
**Director Since:** October 2005 (interim lead director of PG&E Corporation and the Utility and interim non-executive Chairman of the Utility Board from May to September 2011)

21

**Current Board Committees:** Nominating and Governance (Chair); Audit; Compensation; Executive

**Current Position:** Retired Executive Vice President, General Counsel, and Secretary of APL Limited (international transportation and logistics services company)

**Other Current Public Company Boards:** ABM Industries Incorporated (facilities services) since 1993 (non-executive Chairman of the Board; member of compensation committee, *ex officio* member of audit committee, corporate citizenship and communications committee, executive committee, and governance committee)

**Prior Positions:**

Ms. Herringer held various executive positions at APL Limited and was responsible at various times for overseeing the legal, risk management, corporate communications, human resources, internal audit, tax, and community affairs functions. Prior to joining APL Limited, she was a partner in the international law firm of Morrison & Foerster LLP, Senior Vice President and General Counsel of Transamerica Corporation (insurance and financial services), and a partner in the law firm of Orrick, Herrington & Sutcliffe LLP.

**Other Board Experience:**

Ms. Herringer is a member of the boards of trustees of Mills College, Vassar College, and the San Francisco Museum of Modern Art.

**Experience, Skills, and Expertise:**

Ms. Herringer brings leadership, business, legal, and management skills developed as an executive and a director of, and legal counsel to, other large public companies. Her specific expertise includes legal, corporate governance, risk management, and internal audit matters, as well as corporate transactions and mergers and acquisitions.

79.    Upon information and belief, Defendant Herringer is a citizen of the State of California.

**Defendant Johnson**

80.    Defendant Jeh C. Johnson ("Johnson") served as a PG&E director from March 30, 2017 to March 22, 2018, and as a director of the Utility from March 30, 2017 to December 2017. He served as a member of the Safety and Nuclear Oversight Committee of both Boards and PG&E's Compliance and Public Policy Committee.

81.    For the fiscal year ended December 31, 2017, Defendant Johnson received $210,595 in compensation from the Company, comprised of $70,550 in fees earned or paid in cash, $139,989 in stock awards, and $56 in all other compensation.

22

82.     The Company's 2017 Proxy Statement stated the following about Defendant Johnson:

**Jeh C. Johnson**

**Age:** 59
**Current Position:** Partner at Paul, Weiss, Rifkind, Wharton & Garrison LLP (Paul, Weiss) (international law firm) since January 2017

**Prior Positions:**

Secretary Johnson has served in three Senate-confirmed presidential appointments. Before rejoining Paul, Weiss, he served as U.S. Secretary of Homeland Security (December 2013 to January 2017). Secretary Johnson previously served as General Counsel of the U.S. Department of Defense (2009 to 2012), as General Counsel of the U.S. Department of the Air Force (1998 to 2001), and as an Assistant U.S. Attorney in the Southern District of New York (1989 to 1991). Prior to and between his periods of public service, Secretary Johnson was in private practice at Paul, Weiss (2013, 2001 to 2009, 1992 to 1998, and 1984 to 1988).

**Other Board Experience:**

Secretary Johnson has served as a trustee, director, and governor of Adelphi University, the New York Hall of Science, the Legal Aid Society, the Film Society of Lincoln Center, the New York Community Trust, the City Bar Fund, the Roosevelt Institute, the National Institute of Military Justice, the Federal Bar Council, the Fund for Modern Courts, Vera Institute of Justice, and the Lawyers' Committee for Civil Rights Under Law. He previously chaired the Judiciary Committee of the New York City Bar Association, and served as a member of the Executive Committee of New York City Bar. He is currently a member of the Council on Foreign Relations.

**Experience, Skills, and Expertise:**

Secretary Johnson brings extensive leadership, legal, and management skills developed while serving in the public sector and as legal counsel to large public companies and their boards of directors. His specific experience includes crisis and risk management, cybersecurity and other security matters, disaster response, critical infrastructure protection, federal and state policy issues, and regulatory matters. He has a proven track record of navigating through complex and challenging issues in both his public service career and his private law practice.

83.     Upon information and belief, Defendant Johnson is a citizen of the State of New York.

**Defendant Kelly**

84.     Defendant Richard C. Kelly ("Kelly") has served as a PG&E director and as a Utility

director since 2013, as PG&E's non-executive Chairman since December 2017, and is a member of

the Audit Committee of both Boards. He also served on the Safety and Nuclear Oversight Committee of both Boards between 2014 and 2017. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Kelly beneficially owned 11,747 shares of PG&E's common stock and common stock equivalents. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Kelly owned approximately $765,434 worth of PG&E stock.

85.     For the fiscal year ended December 31, 2017, Defendant Kelly received $284,752 in compensation from the Company, comprised of $144,667 in fees earned or paid in cash, $139,989 in stock awards, and $96 in all other compensation.

86.     The Company's 2018 Proxy Statement stated the following about Defendant Kelly:

**Richard C. Kelly**

**Age:** 71
**Director Since:** June 2013; independent non-executive Chair of the Board of PG&E Corporation since December 2017
**Current Board Committees:** Nominating and Governance (Chair); Audit; Compensation; Executive (Chair of PG&E Corporation Executive Committee)
**Current Position:** Retired Chairman and CEO of Xcel Energy Inc. (utility supplier of electric power and natural gas service operating in eight Western and Midwestern states)

**Prior Positions:**

Mr. Kelly served as Chairman and CEO of Xcel Energy Inc. (utility supplier of electric power and natural gas service operating in eight Western and Midwestern states) from 2005 to 2011. He also served in various executive positions at Xcel Energy, including President, COO, and Chief Financial Officer. Before the merger forming Xcel Energy Inc. in 2000, he held a variety of finance-related positions at predecessor companies New Century Energies and Public Service of Colorado.

**Prior Public Board Service During the Past Five Years:**

Canadian Pacific Railway (transcontinental railway in Canada and the United States) (2006 to 2014)

**Other Board Experience:**

Mr. Kelly is former Chairman of the Edison Electric Institute, a former board member of the Electric Power Research Institute and the Nuclear Energy Institute, and a former

member of the National Petroleum Council and the National Advisory Council of the National Renewable Energy Laboratory. Mr. Kelly previously served as a director of BrightSource, Energy, Inc. (solar thermal technology). He currently serves on the Board of Trustees of Regis University.

**Experience, Skills, and Expertise:**

Mr. Kelly brings over 40 years of diverse energy experience and leadership as a utility industry executive. His specific expertise includes finance, mergers and acquisitions, utility operations, safety, clean energy, and nuclear and renewable power.

87.     Upon information and belief, Defendant Kelly is a citizen of the State of Colorado.

### Defendant Kimmel

88.     Defendant Roger H. Kimmel ("Kimmel") has served as a PG&E director and as a Utility Director since 2009, and is the Chair of PG&E's Compliance and Public Policy Committee and a member of PG&E's Finance Committee. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Kimmel beneficially owned 27,394 shares of PG&E's common stock and common stock equivalents. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Kimmel owned approximately $1.8 million worth of PG&E stock.

89.     For the fiscal year ended December 31, 2017, Defendant Kimmel received $265,965 in compensation from the Company, comprised of $125,880 in fees earned or paid in cash, $139,989 in stock awards, and $96 in all other compensation.

90.     The Company's 2018 Proxy Statement stated the following about Defendant Kimmel:

**Roger H. Kimmel**

**Age:** 71
**Director Since:** January 2009
**Current Board Committees:** Compliance and Public Policy (Chair); Finance; Nominating and Governance; Executive
**Current Position:** Vice Chairman of Rothschild Inc. (international investment banking firm) since January 2001
**Other Current Public Company Boards:** Endo International plc (global specialty healthcare company) since May 2007 (non-executive Chairman of the Board; serves on nominating and governance committee (chair), audit committee, compensation committee, and operations committee)

**Prior Positions:**

Mr. Kimmel previously was a partner in the international law firm of Latham & Watkins LLP, where his practice focused on mergers and acquisitions, capital markets, and corporate governance matters.

**Prior Public Board Service During the Past Five Years:**

Schiff Nutrition International, Inc. (vitamins and nutritional supplements company) (1996 to 2012)

**Other Board Experience:**

Mr. Kimmel has also served on the boards of a variety of privately held companies. He was Chairman of the Board of Trustees of the University of Virginia Law School Foundation from 2009 to June 2015, and was a member of the Board of Trustees of the Riverdale Country School from 2010 to 2016.

**Experience, Skills, and Expertise:**

Mr. Kimmel's investment banking work includes cross-border and domestic public company mergers and acquisitions, capital market transactions, corporate governance, and advising special committees of boards of directors. He brings business, finance, and legal skills, as well as leadership and problem-solving skills developed as an executive and a director of, and legal counsel to, other large public companies. His specific expertise includes corporate transactions, finance, investment banking, international business, corporate governance, and legal matters.

91.     Upon information and belief, Defendant Kimmel is a citizen of the State of Connecticut.

**Defendant Meserve**

92.     Defendant Richard A. Meserve ("Meserve") has served as a PG&E director and Utility director since 2006, is the Chair of the Safety and Nuclear Oversight Committee of both Boards, and is a member of PG&E's Compliance and Public Policy Committee. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Meserve beneficially owned 21,552 shares of PG&E's common stock and common stock equivalents. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Meserve owned over $1.4 million worth of PG&E stock.

93.     For the fiscal year ended December 31, 2017, Defendant Meserve received $275,085

in compensation from the Company, comprised of $135,000 in fees earned or paid in cash, $139,989

in stock awards, and $96 in all other compensation.

94.     The Company's 2018 Proxy Statement stated the following about Defendant Meserve:

**Richard A. Meserve**

**Age:** 73
**Director Since:** December 2006
**Current Board Committees:** Safety and Nuclear Oversight (Chair); Compliance and Public Policy; Nominating and Governance; Executive
**Current Position:** President Emeritus, Carnegie Institution of Washington (not- for-profit scientific research institution); Senior Of Counsel to the international law firm of Covington & Burling LLP since April 2004; consultant on nuclear matters

**Prior Positions:**

Prior to serving as President of the Carnegie Institution of Washington (2003 to 2014), Dr. Meserve was Chairman of the U.S. Nuclear Regulatory Commission. He previously was a partner of Covington & Burling LLP. He also served as a member of the Blue Ribbon Commission on America's Nuclear Future (chartered by the U.S. Secretary of Energy) (2010 to 2012), as legal counsel to President Carter's science and technology advisor, and as a law clerk to Justice Harry A. Blackmun of the U.S. Supreme Court.

**Prior Public Board Service During the Past Five Years:**

Duke Energy Corporation (gas and electric energy company) (2015 to 2016)

**Other Board Experience:**

Dr. Meserve has been a director of Tri Alpha Energy, Inc. (development of clean fusion energy technology) since 2012. He also serves on the Council and Trust of the American Academy of Arts and Sciences, the board of trustees of the Carnegie Institution of Washington, and the board of directors of the Kavli Foundation.

**Experience, Skills, and Expertise:**

Dr. Meserve brings technical, legal, regulatory, public policy, and safety expertise in numerous areas, including nuclear power, energy policy, and climate change, as well as leadership and business skills developed as an executive and a director of, and an advisor to, national and international scientific, research, and legal organizations. He currently is co-chairman of the U.S. Department of Energy's Nuclear Energy Advisory Committee and Chairman of the International Nuclear Safety Group, which is chartered by the International Atomic Energy Agency.

95.     Upon information and belief, Defendant Meserve is a citizen of the District of Columbia.

**Defendant Miller**

96.     Defendant Forrest E. Miller ("Miller") has served as a PG&E director and as a Utility director since 2009, and is a member of the Audit Committee of both Boards. Defendant Miller served as PG&E's lead director from May 2017 to, upon information and belief, December 2017 when Defendant Earley retired and Defendant Kelly was appointed non-executive Chairman of the Board of PG&E.[9] He has also served as a member of the Utility's board since 2009. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Miller beneficially owned 36,571 shares of PG&E's common stock and common stock equivalents. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Miller owned approximately $2.4 million worth of PG&E stock.

97.     For the fiscal year ended December 31, 2017, Defendant Miller received $318,904 in compensation from the Company, comprised of $178,819 in fees earned or paid in cash, $139,989 in stock awards, and $96 in all other compensation.

98.     The Company's 2018 Proxy Statement stated the following about Defendant Miller:

**Forrest E. Miller**

**Age:** 65
**Director Since:** February 2009; independent non-executive Chair of the Board of the Utility since May 2017
**Current Board Committees:** Compensation (Chair); Audit; Executive (Chair of the Utility Executive Committee)
**Current Position:** Retired Group President-Corporate Strategy and Development of AT&T Inc. (communications holding company)

**Prior Positions:**

---

[9] The Company did not file a Form 8-K reflecting that Defendant Miller is no longer the independent lead director. The 2018 Proxy Statement outlines the Company's policy of appointing an independent lead director when the Chair is not independent, and notes that PG&E had, as of the date of filing, an independent Chairman, and no independent lead director.

Verified Shareholder Derivative and Double Derivative Complaint

Prior to serving as Group President-Corporate Strategy and Development of AT&T Inc. (2007 to 2012), Mr. Miller served as Group President of AT&T Corp., the Global Enterprise division of AT&T Inc., and held a variety of executive positions at SBC Communications (communications holding company) and its predecessor Pacific Telesis Group.

**Other Board Experience:**

Mr. Miller currently serves as a member of the Board of Directors of the Baylor Health Care System Foundation in Dallas, Texas.

**Experience, Skills, and Expertise:**

Mr. Miller brings strategic management, leadership, and business skills developed as an executive of other large public companies in both regulated and competitive markets, as well as specific expertise in a number of areas, including strategic planning, business development, corporate finance, audit, mergers and acquisitions, government and regulatory affairs, and human resources.

99.     Upon information and belief, Defendant Miller is a citizen of the State of Texas.

**Defendant Mullins**

100.     Defendant Eric D. Mullins ("Mullins") has served as a PG&E director and as a Utility director since 2016, and is a member of the Audit Committee and the Safety and Nuclear Oversight Committee of both Boards. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Mullins beneficially owned 1,000 shares of PG&E's common stock equivalents. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Mullins owned approximately $65,160 worth of PG&E common stock equivalents.

101.     For the fiscal year ended December 31, 2017, Defendant Mullins received $260,085 in compensation from the Company, comprised of $120,000 in fees earned or paid in cash, $139,989 in stock awards, and $96 in all other compensation.

102.     The Company's 2018 Proxy Statement stated the following about Defendant Mullins:

**Eric D. Mullins**

**Age:** 55
**Director Since:** September 2016

29

**Current Board Committees:** Audit; Safety and Nuclear Oversight

**Current Position:** Co-CEO of Lime Rock Resources, L.P. (private equity investment firm that acquires, operates, and improves oil and natural gas properties in the U.S.) since 2005

**Other Current Public Company Boards:** Anadarko Petroleum Company (independent oil and natural gas exploration and production company) since May 2012 (serves on audit committee (chair) and executive committee)

**Prior Positions:**

Prior to co-founding Lime Rock Resources, L.P. in 2005, Mr. Mullins served as a managing director in the investment banking division of Goldman Sachs & Co., where he led numerous financing, structuring, and strategic advisory transactions for public and private oil and gas exploration and production companies in the division's Natural Resources Group.

**Other Board Experience:**

Mr. Mullins currently serves as a member of the Baylor College of Medicine Board of Trustees.

**Experience, Skills, and Expertise:**

Mr. Mullins brings operational, business development, and mergers and acquisition experience in the energy sector, as well as director and audit committee experience from his other public company board service. He also brings strategic management, leadership, and corporate financial expertise developed as an executive in the investment banking industry working with both public and private companies in the natural resources and utilities sector.

103.    Upon information and belief, Defendant Mullins is a citizen of the State of Texas.

**<u>Defendant Parra</u>**

104.    Defendant Rosendo G. Parra ("Parra") has served as a PG&E director and a Utility director since 2009, and is a member of the Safety and Nuclear Oversight Committee of both Boards. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Parra beneficially owned 13,842 shares of PG&E's common stock and common stock equivalents. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Parra owned approximately $1 million worth of PG&E stock and common stock equivalents.

Verified Shareholder Derivative and Double Derivative Complaint

105.    For the fiscal year ended December 31, 2017, Defendant Parra received $261,085 in compensation from the Company, comprised of $120,000 in fees earned or paid in cash, $139,989 in stock awards, and $1,096 in all other compensation.

106.    The Company's 2018 Proxy Statement stated the following about Defendant Parra:

**Rosendo G. Parra**

---

**Age:** 58
**Director Since:** September 2009
**Current Board Committees:** Compensation; Nominating and Governance; Safety and Nuclear Oversight
**Current Position:** Retired executive of Dell Inc. (international information technology company); co-founder and Partner of Daylight Partners (technology-focused venture capital firm) since December 2007

**Prior Positions:**

Mr. Parra previously held various executive and senior management positions at Dell Inc., including Senior Vice President for the Home and Small Business Group and Senior Vice President and General Manager, Dell Americas. In those roles, he led Dell Inc.'s activities in the Americas, including marketing, sales, manufacturing, logistics/distribution, call center operations, and services to all customer segments in the Americas.

**Prior Public Board Service During the Past Five Years:**

Brinker International (casual restaurant dining company) (2004 to 2015); NII Holdings, Inc. (mobile communications services in Latin America) (2008 to 2015)

**Experience, Skills, and Expertise:**

Mr. Parra brings business management, leadership, and problem-solving skills developed as an executive and a director of other large public companies, and specific experience in various areas, including technology, product development, manufacturing, sales, marketing, and customer service.

107.    Upon information and belief, Defendant Parra is a citizen of the State of Texas.

**Defendant Rambo**

108.    Defendant Barbara L. Rambo ("Rambo") has served as a PG&E director and as a Utility director since 2005, and is a member of PG&E's Finance Committee. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Rambo beneficially owned 25,833 shares of PG&E's

common stock and common stock equivalents. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Rambo owned approximately $1.7 million worth of PG&E stock.

109.    For the fiscal year ended December 31, 2017, Defendant Rambo received $270,085 in compensation from the Company, comprised of $130,000 in fees earned or paid in cash, $139,989 in stock awards, and $96 in all other compensation.

110.    The Company's 2018 Proxy Statement stated the following about Defendant Rambo:

**Barbara L. Rambo**

**Age:** 65
**Director Since:** January 2005
**Current Board Committees:** Finance (Chair); Compensation; Nominating and Governance; Executive
**Current Position:** CEO of Taconic Management Services (management consulting company) since October 2009

**Prior Positions:**

Ms. Rambo has held various executive positions with companies in the financial services and technology sectors. Prior to joining Taconic Management Services, she was CEO, Vice Chair, and a director of Nietech Corporation (consumer payments technology company) (2002 to 2009). She previously was CEO of Open Close Technologies (financial services technology company) (2000 to 2002). Ms. Rambo assumed that position after holding a number of executive positions at Bank of America, including head of National Commercial Banking.

**Prior Public Board Service During the Past Five Years:**

West Marine, Inc. (boating specialty retailer) (2009 to 2017) (independent board chair); International Rectifier Corporation (power management technologies) (2009 to 2015).

**Other Board Experience:**

Ms. Rambo currently serves as a director of MUFG Union Bank, N.A. and MUFG Americas Holdings Corporation (Mitsubishi UFJ Financial Group - corporate, commercial, and retail banking, wealth management, investment banking). She previously served on the boards of UnionBanCal Corporation (2007 to 2009), and Gymboree Corporation (1996 to 2007).

**Experience, Skills, and Expertise:**

Ms. Rambo brings leadership and business skills developed as an executive and a director of other large public companies, with a focus on the financial services and technology sectors, and specific experience in corporate finance, capital markets, corporate strategy, sales and marketing, operations, and executive management.

111.    Upon information and belief, Defendant Rambo is a citizen of the State of New York.

**Defendant Smith**

112.    Defendant Anne Shen Smith ("Smith") has served as a PG&E director and as a Utility director since 2015, and is a member of the Safety and Nuclear Oversight Committee of both Boards, PG&E's Compliance and Public Policy Committee, and PG&E's Finance Committee. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Smith beneficially owned 4,374 shares of PG&E's common stock and common stock equivalents. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Smith owned approximately $285,009 worth of PG&E stock and common stock equivalents.

113.    For the fiscal year ended December 31, 2017, Defendant Smith received $272,585 in compensation from the Company, comprised of $131,500 in fees earned or paid in cash, $139,989 in stock awards, and $1,096 in all other compensation.

114.    The Company's 2018 Proxy Statement stated the following about Defendant Smith:

**Anne Shen Smith**

**Age:** 64
**Director Since:** February 2015
**Current Board Committees:** Compliance and Public Policy; Finance; Safety and Nuclear Oversight
**Current Position:** Retired Chairman and CEO of Southern California Gas Company (natural gas utility subsidiary of Sempra Energy serving southern California and portions of central California)

**Prior Positions:**

Prior to serving as Chairman and CEO of Southern California Gas Company (SoCalGas) (2012 to 2014) and President of SoCalGas (2012), Ms. Smith held various executive positions at that company, including COO (2010 to 2012), Senior Vice President – Customer Services (2004 to 2010), and Vice President of Environment and

33

Safety. She also served as Senior Vice President – Customer Services of San Diego Gas & Electric Company (natural gas and electric utility subsidiary of Sempra Energy serving San Diego County, California and a portion of Orange County, California) during her tenure in that position for SoCalGas (2004 to 2010).

**Prior Public Board Service During the Past Five Years:**

Southern California Gas Company (2012 to 2014)

**Other Board Experience:**

Ms. Smith served as a board member of the American Gas Association, the Southern California Leadership Council, the UC Davis Energy Efficiency Center, Asian Americans Advancing Justice – Los Angeles, the California League of Conservation Voters Education Fund, and Coalition for Clean Air.

**Experience, Skills, and Expertise:**

Ms. Smith brings over 38 years of diverse energy experience and leadership as a utility industry executive. Her specific expertise includes utility operations, safety, environmental policy, strategic planning, customer service, external affairs, and information technology.

115.    Upon information and belief, Defendant Smith is a citizen of the State of California.

**<u>Defendant Stavropoulos</u>**

116.    Defendant Nickolas Stavropoulos ("Stavropoulos") served as a director of the Utility beginning in 2015, and served as the President and Chief Operating Officer of the Utility beginning March 1, 2017. He retired from his executive and board positions at the Utility effective September 1, 2018. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant Stavropoulos beneficially owned 37,896 shares of PG&E's common stock and common stock equivalents. Given that the price per share of PG&E's common stock at the close of trading on March 8, 2017 was $65.16, Stavropoulos owned approximately $2.5 worth of PG&E stock and common stock equivalents.

117.    For the fiscal year ended December 31, 2017, Defendant Stavropoulos received $6,413,256 in compensation from the Company. This included $777,500 in salary, $4,250,151 in stock awards, $768,539 in non-equity incentive plan compensation, $538,693 in change in pension value and nonqualified deferred compensation earnings, and $78,393 in all other compensation.

118.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Stavropoulos made no purchases of PG&E stock, and made the following purchases of PG&E stock. He sold 1,439 shares of PG&E stock on August 17, 2015 at $54.17 per share, from which he benefited in the amount of approximately $77,951. He sold 14,015 shares of PG&E stock on March 4, 2016 at $56.24 per share, from which he benefited in the amount of approximately $788,204. He sold 11,085 shares of PG&E stock on May 26, 2017 at $67.37 per share, from which he benefited in the amount of approximately $746,976. He sold 1,101 shares of PG&E stock on August 22, 2017 at $69.43 per share, from which he benefited in the amount of approximately $76,442. He sold 428 shares of PG&E stock on March 6, 2018 at $41.93 per share, from which he benefited in the amount of approximately $17,946. Thus, in total, he sold 28,068 shares during the period in which the PG&E's share price was artificially inflated due to the false and misleading statements alleged herein, for which he received $1,707,339 in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions, were exposed demonstrate his motive in facilitating and participating in the scheme.

119.     The Company's 2018 Proxy Statement stated the following about Defendant Stavropoulos:

**Nickolas Stavropoulos**

**Age:** 60
**Director Since:** August 2015 (Utility)
**Current Board Committees:** Executive (Utility)
**Current Position:** President and COO, Pacific Gas and Electric Company

**Prior Positions:**

Prior to serving as President and COO of the Utility, Mr. Stavropoulos was the Utility's President, Gas (August 2015 to February 2017) and Executive Vice President, Gas Operations (June 2011 to August 2015). In his role as President, Gas, Mr. Stavropoulos led all aspects of the Utility's gas transmission and distribution operations, including

planning, engineering, maintenance and construction, and emergency response, as well as enterprise-wide IT, physical and cyber security, safety, health and environmental, supply chain, and transportation/fleet/real estate organizations. Before joining the Utility, he served as Executive Vice President and COO of National Grid (2007 to 2011) (multinational electricity and gas utility), where he was responsible for all aspects of its U.S. gas distribution business. Prior to that role, Mr. Stavropoulos was President of KeySpan Energy Delivery, where he led the company's gas distribution group, field operations, and sales and marketing teams. He has also held several senior leadership roles at Colonial Gas Company and Boston Gas.

**Prior Public Board Service During the Past Five Years:**

Dynamics Research Corporation (U.S. government services, information technology, and management consulting firm) (2005 to 2014)

**Other Board Experience:**

Mr. Stavropoulos is a member of the Board of Directors of the National Safety Council (2017 to present), the Gas Technology Institute (2016 to present), and the American Gas Association (2015 to present). He has served on the Board of Trustees of Bentley University since 2009.

**Experience, Skills, and Expertise:**

Mr. Stavropoulos brings over 35 years of energy industry operations leadership, as well as detailed knowledge of the U.S. natural gas sector. He has extensive executive management, business, and leadership experience in areas such as safety, utility operations, information technology, regulatory affairs, strategic planning, supply chain, finance, sales, business development, and marketing.

120.    Upon information and belief, Defendant Stavropoulos is a citizen of the State of California.

**Defendant B.L. Williams**

121.    Defendant Barry Lawson Williams ("B.L. Williams") served as a PG&E director from 1996 to May 30, 2017, and was a member of the Audit Committee of both Boards. He served as the lead director of the Company from 2014 until his retirement in 2017. He also served as a Utility director from 1990 to May 2017. According to the 2017 Proxy Statement, as of March 8, 2017, Defendant B.L. Williams beneficially owned 43,481 shares of PG&E's common stock and common stock equivalents. Given that the price per share of PG&E's common stock at the close of trading on

36

March 8, 2017 was $65.16, B.L. Williams owned over $2.8 million worth of PG&E stock and common stock equivalents.

122.    For the fiscal year ended December 31, 2017, Defendant B.L. Williams received $76,841 in compensation from the Company, comprised of $76,745 in fees earned or paid in cash and $96 in all other compensation.

123.    The Company's 2016 Proxy Statement stated the following about Defendant B.L. Williams:

**Barry Lawson Williams**

**Age:** 71
**Director Since:** December 1996, and lead director since May 2014 (PG&E Corporation); September 1990, and independent non-executive Chairman of Board since May 2014 (Utility)
**Current Board Committees:** Compensation (Chair); Audit; Finance; Executive
**Current Position:** Retired Managing General Partner and President of Williams Pacific Ventures, Inc. (business investment and consulting) since 1987
**Other Current Public Company Boards:** Navient (loan management, servicing, and asset recovery; formerly SLM Corporation) since 2000 (serves on finance and operations committee (chair), compensation and personnel committee, and executive committee)

**Prior Positions:**

Mr. Williams has been a general partner in various real estate joint ventures located primarily within the Utility's service territory.

**Prior Public Board Service During the Past Five Years:**

The Simpson Manufacturing Company Inc. (building construction products) (1994 to 2014); Ameron International Corporation (multi-national manufacturer of highly engineered products and materials for the chemical, industrial, energy, transportation, and infrastructure markets) (2010 to 2011).

**Other Board Experience:**

Mr. Williams has served as a director of CH2M Hill Companies, Ltd. (engineering) since 1996. He previously served on the Board of Trustees of The Northwestern Mutual Life Company (life and disability insurance and annuities) (1986 to 2015). Mr. Williams currently is a member of the Board of Directors of Sutter Health (community-based non-profit health care), and the Governing Board of Management Leadership for

Verified Shareholder Derivative and Double Derivative Complaint

Tomorrow (MLT) (non-profit organization supporting underrepresented students with skills and relationships needed to succeed in business).

**Experience, Skills, and Expertise:**

Mr. Williams brings management, leadership, and business skills developed as an executive and a director of numerous public and privately held companies. He has experience in numerous areas, including financial, audit, engineering, construction, real estate, and environmental matters, as well as mediation expertise. Mr. Williams' involvement in the local community provides a valuable perspective on the Utility's customer base. He also has an in-depth knowledge of PG&E Corporation and the Utility.

124.    Upon information and belief, Defendant B.L. Williams is a citizen of the State of California.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

125.    By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

126.    Each director, officer, and controller of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

127.    The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controllers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

Verified Shareholder Derivative and Double Derivative Complaint

128.   To discharge their duties, the officers, directors, and controllers of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

129.   Each Individual Defendant, by virtue of his, her, or its position as a director, officer, and/or controlling shareholder owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and controllers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers, directors, and/or controllers of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

130.   As senior executive officers, directors, and controllers of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

131.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California and the United States, and pursuant to the Company's own Code of Conduct and Director Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

132.    Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

133.    At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

134.    Because of their advisory, executive, managerial, directorial, and controlling positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the Company.

135.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

136.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

Verified Shareholder Derivative and Double Derivative Complaint

137.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

138.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of the Company was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

139.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

140.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

## THE COMPANY'S CODE OF CONDUCT

141.    The Company's Code of Conduct provides that, as used in the Code of Conduct, "'PG&E refers to PG&E Corporation and its affiliates and subsidiaries, including Pacific Gas and Electric Company."

142.    The Company's Code of Conduct (the "Code of Conduct") states that "[e]very PG&E employee is responsible for complying with the Code, laws, and regulations, in all actions."

143.    The Code of Conduct notes that "PG&E does not grant waivers to the Code of Conduct."

144.    The Code of Conduct outlines the following actions that PG&E leaders must take:

• *I will model compliance with this Code of Conduct and other relevant PG&E policies and standards.*

• *I won't direct my employees to violate this Code, a law, a regulation or a company policy or procedure*.

 • I won't engage in retaliation and will address acts of retaliation if brought to my attention.

 • I will listen to and follow up with employees who raise concerns.

(Emphasis added.)

145.    The Code of Conduct provides, regarding reporting concerns, in relevant part:

*It's your responsibility to raise concerns about safety, misconduct, or violations of laws, regulations or internal requirements*. If you are uncertain about a situation, you have a duty to seek clarification and guidance on interpretations of the Code, safety issues, ethics, compliance and legal issues.

* * *

Contact the Corrective Action Program (CAP) at 1-855-85-GOCAP to report safety and equipment issues, non-compliance, ineffective or inefficient work processes and procedures, and process improvement ideas. You may remain anonymous if you wish.

(Emphasis added.)

146.    The Code of Conduct provides the following, non-exhaustive examples of misconduct:

43

• Improper use of drugs or alcohol

• Acts or threats of violence

• ***Fraud***

• ***Falsification of company records***

• Retaliation

• Conflicts of interest

• Inappropriate sharing of company data

• Harassment and discrimination

• ***Questionable accounting, auditing practices or internal controls***

• ***Violations of the law***

(Emphasis added.)

147.    Regarding fraud, the Code of Conduct states, in relevant part:

> ***Fraud is intentionally misrepresenting or concealing facts***. Fraud can also occur when a person makes intentionally misleading allegations. Examples of fraud may include falsifying documents, misuse of company credit cards, intentionally overcharging customers or changing a family member's account in our billing system.
>
> **Fraud prevention**
>
> ***PG&E is committed to maintaining accurate books, records and financial and non-financial reports***. Fraud will not be tolerated.

(Bold subheading in original, bold & italic emphasis added.)

148.    The Code of Conduct provides, in a section entitled "Communicating with Customers and the Public," that "communication with customers and the public should be clear, accurate, open and consistent, and should always demonstrate utmost concern for the public's benefit and safety."

149.    The Code of Conduct provides, in a section entitled "Building Trust with Governments," that:

> PG&E is committed to complying with all federal, state and local laws, rules and regulations. We expect employees to meet all legal and regulatory requirements imposed by all governmental bodies that regulate our business.

44

Verified Shareholder Derivative and Double Derivative Complaint

We are also fully committed to abiding by all laws governing interactions between the company and various governmental bodies. We respond appropriately to all government inquiries and investigations.

* * *

**Disclosures and public communications**

PG&E Corporation and Pacific Gas and Electric Company must comply with federal laws and regulations that require the disclosure of certain information related to Securities and Exchange Commission (SEC) filings. If you are asked to review a draft SEC report, respond promptly to help ensure that the SEC reports, other public disclosures, and the information contained within, are full, fair, timely, accurate, understandable and complete.

150.    The Code of Conduct provides, regarding insider trading, that: "[i]nsider trading is illegal. Never disclose or 'tip' inside information to others, or buy and sell securities based on material information you receive as an employee of PG&E."

151.    The Code of Conduct provides, that employees "should promptly report violations or suspected violations of this Code."

152.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. Five of the Individual Defendants violated the code by selling shares of Company stock during the Relevant Period while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, model compliance with the Code of Conduct, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## THE COMPANY'S DIRECTOR CODE OF CONDUCT

153. The Company's Director Code of Conduct, "adopted by the Boards of Directors of PG&E Corporation and Pacific Gas and Electric Company," "outlines the ethical standards and principles that enable directors to make decisions that support and lead PG&E's Mission, Vision and Culture."

154. The Director Code of Conduct states that "[t]he ethics standards in this Code apply to all directors of PG&E." "Every director must read and understand [the Director Code of Conduct] and its application to the performance of his or her ethical responsibilities. PG&E holds every director accountable for adherence to [the Director Code of Conduct]."

155. Regarding reporting ethical or legal violations, the Director Code of Conduct provides that "[i]f a director encounters activities that he or she believes to be illegal or unethical, he or she must speak up promptly."

156. Regarding "Compliance with Applicable Laws," the Director Code of Conduct states, in relevant part: "[e]ach director must exercise his or her duty of oversight in compliance with the laws, rules, and regulations of the United States, as well as the states, counties, cities, and other jurisdictions in which PG&E operates."

157. Regarding "Public Company Reporting," the Director Code of Conduct states, in relevant part:

> PG&E must comply with federal laws and regulations that require the disclosure of certain information related to SEC filings, and *it is critical that these SEC filings be full, fair, accurate, timely and responsible.* If a director is asked to provide information for such filings, he or she is expected to take this responsibility seriously and to provide prompt and accurate responses.

(Emphasis added.)

158. In violation of the Director Code of Conduct, the Individual Defendants serving as directors of the Company conducted little, if any, oversight of the Company's engagement in the

Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Director Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and properly report violations of the Director Code of Conduct.

## THE COMPANY'S COMMITTEE CHARTERS

159.   PG&E has adopted a Charter for its Compliance and Public Policy Committee (the "Compliance Committee"). That charter requires, in relevant part, that the Compliance Committee:

1. *Review and oversee the corporation's compliance program, including, but not limited to, evaluating its effectiveness*.

2. *Review periodic reports from management*, including, but not limited to, the Chief Ethics and Compliance Officer (the "CECO") and other operations, compliance, and legal personnel, *with respect to (a) the corporation's compliance with laws, regulations, and internal policies and standards*, *(b) significant pending or threatened litigation and government investigations, examinations, inquiries, demands, or proceedings, in each case which raise or would be expected to raise significant compliance issues, and (c) any other significant claim or complaint alleging that the corporation is not in compliance with laws, regulations, or internal policies and standards.*

3. Review (a) periodic reports with respect to internal or external compliance reviews or audits conducted by the corporation, regulators, or third parties, and (b) reports by management with respect to their work to address any significant deficiencies, findings, and recommendations identified in any such review or audit.

4. Review the corporation's statements of policy concerning conflicts of interest and general business ethics (including the codes of business conduct and/or ethics).

5. *At least semiannually, meet jointly and coordinate with the Audit Committees, the PG&E Corporation SNO [Safety and Nuclear Oversight] Committee, and the Pacific Gas and Electric Company SNO Committee to discuss the corporation's compliance program and monitor that all significant compliance issues are addressed by the appropriate Board committees*.

6. Coordinate with management to facilitate the regular receipt by the Boards of Directors of appropriate reports and materials regarding significant compliance issues.

7.  ***Monitor that a consistent commitment to maintaining an effective compliance program is conveyed to employees, contractors, and other relevant stakeholders***.

(Emphasis added.)

160.   PG&E has adopted a Charter for its Safety and Nuclear Oversight Committee (the "Safety Committee"). That charter requires, in relevant part, that the Safety Committee shall, among other things:

1.  ***Review significant policies and issues related to safety, operational performance, and compliance***.

2.  ***Review with management the principal risks related to or arising out of PG&E's Operations and Facilities*** (including risks that are identified through PG&E's enterprise risk management program and that are selected in consultation with this Board of Directors and its committees, as applicable), and assess the effectiveness of PG&E's programs to manage or mitigate such risks, ***including with respect to***:

    •  the safe and reliable operation of any nuclear facilities owned by PG&E;

    •  integrity management programs for PG&E's gas operations and facilities; and

    •  ***asset management programs for PG&E's electric operations and facilities***.

3.  ***Review and discuss how PG&E can continue to improve its safety practices and operational performance***.

4.  ***Review and discuss the results of PG&E's goals, programs, policies, and practices with respect to promoting a strong safety culture***.

5.  Review the impact of significant changes in law and regulations affecting safety and operational performance.

6.  Advise this corporation's Compensation Committee on appropriate safety and operational goals to be included in PG&E's executive compensation programs and plans.

7.  Meet at least six times per year. Such meetings shall include at least semiannual joint meetings with the Utility's Safety and Nuclear Oversight Committee, this corporation's Audit Committee, the Utility's Audit Committee, and the corporation's Compliance and Public Policy Committee to discuss PG&E's compliance program and any other topics agreed upon by those committees.

8.  (a) ***Review the adequacy and direction of PG&E's corporate safety functions***, including the appointment and replacement of any chief safety officer of this corporation (or any officer who is similarly given direct responsibility for overseeing enterprise-wide safety matters at the corporation) (the "Chief Safety

48

Officer"), (b) review with the Chief Safety Officer the responsibilities, budget, and staffing of the corporation's safety function, (c) *periodically review PG&E's corporate safety and health functions, goals, and objectives represented in PG&E's five-year planning process, and (d) periodically review reports provided to management by the Chief Safety Officer and any chief safety officer of the Utility* (or any officer who has direct responsibility for overseeing safety matters at the Utility).

9. *Serve as a channel of communication between the Chief Safety Officer and this Board of Directors*.

10. Meet separately with the Chief Safety Officer from time to time, at the discretion of the Chair of the Committee.

11. Report regularly (and at least semiannually) to this Board of Directors on deliberations and actions taken by the Committee, and issues considered and addressed as part of the Committee's oversight responsibilities.

(Emphasis added.)

161.   The Company has adopted a Charter for its Audit Committees. That charter requires, in relevant part, that the Audit Committees shall, among other things:

7. *Review major issues as to the design, implementation, and adequacy of the internal controls of this corporation and its subsidiaries and affiliates* and any special audit steps adopted in light of material control deficiencies (in consultation with the independent auditors and the senior internal auditor).

8. *Review and discuss with management and the independent auditors the corporation's internal controls report* and the independent auditors' attestation report, prior to the filing of the corporation's annual report on Form 10-K.

9. Review and discuss with management and the independent auditors, prior to issuance, the audited consolidated annual and interim financial statements of this corporation and its subsidiaries (the "Financial Statements"), including reviewing this corporation's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

* * *

13. *Review disclosures made by the principal executive officer and the principal financial officer in connection with the officer certifications required for this corporation's annual report on Form 10-K and the quarterly reports on Form 10-Q, regarding all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect this corporation's ability to record, process, summarize, and report financial information, or any fraud that involves management or*

49

*other employees who have a significant role in the corporation's internal control over financial reporting*.

\* \* \*

20. (a) *Review legal and regulatory matters that may have a material impact on the Financial Statements*, including the effect of regulatory and accounting initiatives; *(b) discuss with management the corporation's programs to monitor compliance with laws, regulations, and internal policies and standards; (c) periodically receive reports from the PG&E Corporation Compliance and Public Policy Committee with respect to compliance oversight and related matters*; and (d) at least semiannually, meet jointly with the Pacific Gas and Electric Company Audit Committee, the PG&E Corporation Compliance and Public Policy Committee, the PG&E Corporation Safety and Nuclear Oversight Committee, and the Pacific Gas and Electric Company Safety and Nuclear Oversight Committee to discuss the corporation's compliance program.

(Emphasis added.)

## APPLICABLE REGULATORY REGIME

162.    As a public utility, the Company is subject to extensive state laws and regulations.

163.    The California Public Resources Code requires that utilities manage vegetation near its transmission and distribution lines, keeping a safe and prescribed distance between electrical equipment and vegetation. Applicable sections of the California Public Resources Code include §4292, which requires firebreaks to be maintained, and §4293, which requires that dead and dying trees that may come into contact with power lines must be removed, cut, or trimmed to eliminate hazards.

164.    California Public Utilities Code §451 also requires that the Company "furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

165.    The CPUC is the primary regulator of the Company . CPUC General Order 95, Rule 35, requires that the Company "establish necessary and reasonable clearances," including minimum clearances set by the agency, between vegetation and overhead conducts. Rule 35 further requires that:

When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that dead, rotten or diseased trees or dead, rotten or diseased portions of otherwise healthy trees overhang or lean toward and may fall into a span of supply or communication lines, said trees or portions thereof should be removed.

* * *

When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that its circuit energized at 750 volts or less shows strain or evidences abrasion from vegetation contact, the condition shall be corrected by reducing conductor tension, rearranging or replacing the conductor, pruning the vegetation, or placing mechanical protection on the conductor(s).

166.    CAL FIRE, under an agreement with the U.S. Department of Interior and Department of Agriculture, is authorized to make cause and origin determinations for wildfires that fall within CAL FIRE's jurisdiction.

167.    Under the California Constitution, the doctrine of "inverse condemnation" applies to public utilities. Under the doctrine of inverse condemnation, utilities must compensate individuals when their real property is damaged by the utility in a strict lability regime. However, utilities may recover these costs from the CPUC if they can "affirmatively prove that it reasonably and prudently operated and managed its system." Order Denying Rehearing of Decision (D.) 17-11-033 at 3, App. of SDG&E for Authorization to Recover Costs Related to the 2007 Southern Cal. Wildfires Recorded in the Wildfire Expense Memo Account, App. No. 15-09-010, Decision 18-07-025 (July 12, 2018).

168.    The phrase "reasonable and prudent" means "that at a particular time any of the practices, methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of facts known or which should have been known at the time the decision was made." *Id.*

169.    This cost shifting structure allows the Company to pass costs to ratepayers, and away from the Company and its shareholders, if it can demonstrate it was reasonable and prudent in operating and managing it systems.

170.    As a result, the prudence of the Company's practices is highly material, as demonstrated by a December 21, 2017 report issued by Evercore ISI, which stated, in relevant part:

> [PG&E] reiterated the company routinely inspects, maintains, and replaces poles, and tests and treats wood poles on a frequency that significantly exceeds CPUC requirements. The company claims to have one of, if not the most comprehensive vegetation management programs in the country. Further, the company doubled its vegetation management spending in 2016 due to the drought and tree mortality crisis in California. That being said, ***we still do not know and likely will not know what caused the various fires for some time, whether or not [PG&E]'s equipment was solely or partly the cause, and whether or not the facts will support a ruling at CPUC that [PG&E] acted prudently should they be successfully sued under inverse condemnation***.

(Emphasis added.)

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

171.    PG&E is a holding company that operates primarily through its subsidiary, the Utility. Through the Utility, PG&E is involved in the sale and delivery of electricity and gas in Northern and Central California, and such operations account for the majority of PG&E's revenues.

172.    The Utility serves approximately 16 million California residents located across its 70,000 mile service area spread through Northern and Central California.

173.    The Company has an Enterprise Risk Management ("ERM") program. PG&E's 2017 Corporate Responsibility and Sustainability Report (the "2017 CSR") underscores the involvement of management and the Board in ERM, stating, in relevant part, that, "[a]t PG&E, risk management processes are facilitated by a central group, implemented by each line of business and ***overseen by senior management and the Boards of Directors***." Further, the 2017 CSR asserts that PG&E's "risk management governance structures ***allow risks to be investigated both under a Board of Directors-***

*directed review process* and also from a 'bottoms-up' approach that allows operational experts to apply their knowledge and identify emerging issues for PG&E."[10]

174.    Beginning on or about October 8, 2017, the Wildfires were ignited and began to spread, ultimately burning no less than 240,000 acres of land. The Wildfires resulted in severe property damage and loss of life, including at least 44 deaths, 185 hospitalizations, and the destruction of approximately 8,900 structures.

175.    Investigations of all 17 of the main fires that comprised the Wildfires have been completed to date. All 17 investigations have indicated that the Company's equipment was the cause. Of those, 11 investigations found evidence that the Company had violated state safety regulations.

176.    Due to the fact that the fires exacerbated one another, both through merging and the diversion of scarce firefighting resources, the Company is responsible for damage caused by all of the Wildfires, including the six for which investigations have not uncovered evidence of safety violations to date.

177.    Despite the Company's failure to maintain a safe electricity transmission and distribution system, or remain compliant with state law, the Individual Defendants caused the Company to falsely and misleadingly assert that the Company maintained adequate safety standards and was addressing risks involved with vegetation management during the Relevant Period.

### A History of Safety Failures

178.    The Company has a demonstrated history of safety failures that would have placed the Individual Defendants on notice of the Company's deficient safety programs.

---

[10] Emphasis added.

Verified Shareholder Derivative and Double Derivative Complaint

179.    Between 2004 and 2009 the Company accounted for nearly 60% of the probable violations of federal natural gas safety laws found by federal regulators according to CPUC records, despite operating only 42% of the gas pipeline mileage in the State of California.

180.    A 2013 report by Liberty Consulting Group (the "Liberty Report"), commissioned by the CPUC, found that "several aspects of the PG&E distribution system present significant safety issues." The Liberty Report concluded that 60% of the Company's power lines were at risk of failure due to obsolete equipment, and that approximately 75% of the Company's lines lacked in-line grounding technology. Without in-line grounding, lines cannot be shut down remotely form a command center, and wires remain live until crews arrive at the site to fix them. Based on its findings, Liberty Consulting Group called for the Company to "treat aging infrastructure as an enterprise-level risk."

181.    The CPUC has conducted audits of the Company's electrical systems, finding its facilities to be deficient. A 2013 letter from the CPUC to PG&E revealed that a CPUC audit of one of the Company's divisions found thousands of work orders between 2008 and 2013 had been "completed past their scheduled date of corrective action" and thousands more were then open and past their scheduled date of corrective action. Following another CPUC audit, which found in excess of 3,500 unfilled repair and maintenance requests to PG&E, the CPUC sent PG&E a letter dated December 31, 2015, informing the Company of the late work orders and the CPUC's conclusion that the delays violated CPUC regulations.

182.    The CPUC has concluded that the Company and its management have adopted a "run to failure" strategy with regard to its infrastructure. According to a May 2013 CPUC filing, between 2008 and 2010, "PG&E engaged in a 'run to failure' strategy whereby it deferred needed maintenance" through systematic underfunding. Further, the filing asserted that such underfunding "was not an isolated incident" but instead "represents the culmination of PG&E management's long standing

54

policy to squeeze every nickel it could from PG&E gas operations and maintenance, regardless of the long term 'run to failure' impacts" that the CPUC found PG&E had failed to rebut.

183.    Further, the CPUC has ordered an audit of PG&E as a result of the Company's pattern of spending less than the amount of approved funds for running power lines underground, in order to determine where the approved funds were spent instead.

184.    Somewhat unsurprisingly, these failures to address safety risk led to serious and fatal incidents involving the Company's transmission and distribution facilities.

185.    In 1994, the Company's failure to maintain vegetation in proximity to its transmission equipment led to a fire in the area of the town of Rough and Ready, burning approximately 500 acres and destroying 12 homes (the "Rough and Ready Fire"). As a result of the Company's failure to maintain adequate vegetation management systems, leading to the Rough and Ready Fire, the Company was convicted of 739 counts of criminal negligence, incurring $24 million in penalties.

186.    In 1999, the Company's lax vegetation management practices led to the Pendola fire (the "Pendola Fire"). As result of the Pendola Fire, the Company paid over $37.4 million in settlements ($22.7 million to the CPUC and $14.75 million to the U.S. Forest Service) in connection with its failure to spend money earmarked for tree trimming and removal on such services.

187.    The Company's vegetation management failures caused other fires, including the Sims Fire in 2004 and the Whiskey Fire in 2008.

188.    A natural gas leak in Rancho Cordova, California led to an explosion and fire on December 24, 2008 (the "Rancho Cordova Incident").  The National Transportation Safety Board ("NTSB") attributed the explosion to a section of pipe that did not meet specifications, allowing gas to leak from a coupling installed by PG&E. The Company's 2 hour and 47 minute delay in responding to the fire was found to be a contributing factor to the incident. The $38 million fine imposed on the Company in 2011 as a result of the Rancho Cordova Incident was a record at the time.

189.     On September 9, 2010, a pipeline exploded in San Bruno, California. The resulting residential fire caused eight deaths, injured 58 other individuals, destroyed 38 homes and damaged dozens more (the "San Bruno Incident"). Following the San Bruno Incident, NTSB investigators found that the accident was the result of "inadequate quality assurance and quality control" in addition to an "inadequate pipeline integrity management program." These conditions resulted in PG&E's failure to detect the inadequate welding on the pipeline.

190.     Following its investigation of the San Bruno incident, the NTSB issued a report that found the Company suffered from a "pervasive lack of proactive measures to ensure adoption and compliance with a safety culture." Based on its investigation, the NTSB noted that "the multiple and recurring deficiencies in PG&E operational practices indicate a systemic problem."

191.     On January 12, 2012 independent reports ordered by the State of California were issued, revealing that PG&E had illegally diverted in excess of $100 million from a fund earmarked for safety operations to pay executive compensation and bonuses over a 15 year period. According to *SFGATE*, "[t]he documents link a deficient PG&E safety culture - with its 'focus on financial performance' - to the [San Bruno Incident]."

192.     The San Bruno Incident led to a $1.6 billion fine levied by the CPUC upon that agency's determination that PG&E's negligence led to explosion.

193.     On August 9, 2016—during the Relevant Period—a federal jury found the Utility guilty of willful violations of the Natural Gas Pipeline Safety Act connected to the failures of the Company's pipeline management practices and recordkeeping which led to the San Bruno Incident. The Utility was also found guilty of obstructing an agency proceeding in connection with the Company's attempts to mislead the NTSB during the agency's investigation of the San Bruno Incident. The five year term of probation imposed on the Utility remains in effect.

194.    In September 2015—also during the Relevant Period—a wildfire was ignited when PG&E power lines came into contact with a pine tree, as determined by the CPUC and CAL FIRE (the "Butte Incident"). The Butte Incident fire burned for twenty-two days in Alamor County and Calaveras County, burning nearly 71,000 acres, killing two individuals and destroying nearly 1,000 homes and outbuildings.

195.    CAL FIRE issued a press release on April 28, 2016 announcing that, following "a thorough investigation, CAL FIRE has determined that the [Butte Incident] was sparked by a tree that came into contact with a Pacific Gas & Electric Company powerline." The press release further stated that CAL FIRE had submitted its investigation report to the relevant District Attorneys' offices for their review, and would seek to recover firefighting costs in excess of $90 million from the Company under provisions of California law that allow for the recovery of costs "incurred battling wildfires that are determined to be sparked due to negligence or violations of the law."

196.    CAL FIRE filed suit against the Company on April 13, 2017 to recover $87 million in costs incurred in fighting the Butte Incident fire. The suit, which is currently pending, alleges that the fire was caused by the Utility's negligence in maintaining its vegetation management system.

197.    These incidents provided the Individual Defendants with substantial and inescapable notice that the Company's safety programs were deficient, some of which came during the Relevant Period. Thus, the Individual Defendants were aware of the false and misleading nature of the statements made during the Relevant Period, as alleged herein.

**The Company's Vegetation Management Practices & Spending in Environmental Context**

198.    In 2006, the Company adopted the Vegetation Management Incentive Imitative ("VMII") program. Under the VMII program, the Company shifted resources from annual routine compliance, focused on maintaining compliance with distances between lines and vegetation, to reliability efforts. This had effect of reallocating resources from safety efforts in more rural areas

(which are prone to wildfires) to improving reliability in urban and semi-urban areas. This was accomplished through the use of monetary incentives to contractors.

199.    Thus, the VMII program increased the risk of wildfires in favor of pursuing enhanced reliability.

200.    As alleged by the plaintiffs in a suit filed against the Company in California Superior Court on December 31, 2017 asserting claims on behalf of victims of the Wildfires,[11] the VMII program discouraged the implementation of vegetation safety measures. The same suit alleges that this reallocation of resources led to reduced customer complaints, and, as a result, increased likelihood of management and executive bonuses.

201.    That lawsuit further alleges that a regional officer for a PG&E contractor, Robert Urban, "stated that he had a concern that the bonus system incentivized his employees to not do their job, but PG&E chose to keep this program despite knowing this risk."

202.    A state of emergency was declared by the State of California between January 2014 and April 2017 due to drought conditions.

203.    As a result of the drought and insect infestations, trees began dying at a rate of millions per year, leading the State of California to declare a state of emergency with respect to tree mortality in October 2015. The State's Proclamation of a State of Emergency explicitly required that utilities, among others, "to the extent required by their existing responsibilities to protect the public health and safety, shall undertake efforts to remove dead or dying trees in these high hazard zones that threaten power lines . . . ."

204.    The drought, combined with tree mortality, created a heightened risk of wildfires.

---

[11] *Renata Benham and Dennis McClintick v. PG&E Corporation, et al.*, Case No. CGC-17-563293, (Cal. Super. Ct., S.F. Cty., filed Dec. 12, 2017).

58

205.    Despite this heightened risk, a directive from the state to address dead and dying trees, and the Company's history of safety failures outlined above, the Company's spending on vegetation management remained relatively flat during the Relevant Period.

206.    In a non-public deposition held in April 2017 related to the Butte Incident, Richard Yarnell, PG&E's Vegetation Program Manager for the geographic division containing the area of the Butte Incident fire, stated that: "PG&E—to the best of my knowledge, we have not made any changes as a result of this fire."

207.    According to an undated 2017 CPUC Fact Sheet regarding PG&E's vegetation management spending, the Company's spending on vegetation management underwent modest increases between the years 2014-2016, with 2016 spending approximately 23% higher than in 2013. The relevant table is reproduced below:

**Table showing 2011-2017 history of PG&E annual spending ($ million) on vegetation management**

|  | PG&E Requested | CPUC Authorized | PG&E Spent |
|---|---|---|---|
| 2017 | $201.0 | $201.0 | *$150.4 YTD* |
| 2016 | $198.8 | $198.8 | $198.7 |
| 2015 | $194.2 | $194.2 | $194.1 |
| 2014 | $190.0 | $190.0 | $189.7 |
| 2013 | $180.0 | $161.5 | $161.6 |
| 2012 | $180.0 | $161.5 | $161.5 |
| 2011 | $180.0 | $161.5 | $161.6 |

208.    During the Relevant Period, the Company consistently reported the results of its tree trimming and removal efforts.

209.    On November 18, 2015, Defendant Hogan gave public testimony in front of the Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure Safety of the California Senate, during which he asserted that the Company had removed or trimmed 1.2 million trees.

59

210.    In a press release issued May 3, 2017, the Company asserted that "[i]n 2016, PG&E removed about 236,000 dead or dying trees."

211.    A week later, on May 10, 2017, the Company issued another press release stating "PG&E removed more than 236,000 dead or dying trees last year to prevent them from contacting power lines, starting wildfires or contributing to other public safety risks. This is in addition to the 1.2 million trees that PG&E works each year."

212.    Following the Wildfires, the Company began reporting higher tree maintenance figures. On November 2, 2017, Defendant Williams asserted that the Company clears or removes 1.3 million trees per year. This number continued to climb: on May 25, 2018, the Company issued a press release asserting that "[u]nder PG&E's industry-leading Vegetation Management Program, we . . . prune or remove approximately 1.4 million trees annually."

213.    It has been reported that the Company accepts a non-compliance rate of 1 out of every 100 trees, and engages in selective auditing practices to ensure that it meets that goal. As reported by NBC on November 6, 2017, in an article titled "PG&E's Vegetation Management Program Under Fire After North Bay Blazes":

> **PG&E auditors allow one out of 100 trees they check to violate state power line clearance standards**, NBC Bay Area has learned.
>
> * * *
>
> Amanda Riddle, one of the attorneys in the Butte [Incident] litigation . . . said it emerged during the Butte fire litigation that auditors were giving out a passing grade when one out of 100 trees they checked turned out to be too close to power lines under state standards.
>
> She said while that 99 percent ratio may sound good, it has 55 million trees near its lines.
>
> "That means **a half-million trees out there could fall into power lines and cause a wildfire**," Riddle said. "And obviously that shouldn't be acceptable to anybody."
>
> * * *
>
> **When [PG&E] failed to reach that 99 percent compliance rate in the area around the fire,** she says, **the company just expanded the universe of trees covered in a**

1

*particular audit*.

2

"*So what PG&E does when it doesn't pass, it basically cheats*," Riddle said. "It adds more miles and more miles until it reaches a passing grade."

3

4

(Emphasis added.)

5

214.    On October 17, 2017, the Company reported to the CPUC that it manages

6

approximately 123 million trees. Based on an accepted non-compliance rate of 1%, the Company

7

ostensibly has approximately 1.2 million trees that are out of compliance with regulation in its 70,000

8

square mile service area.

9

### The Company Used Reclosers Despite Increased Risk of Wildfires

10

215.    A means that utility companies use to manage their power grid are devices known as

11

"reclosers." Reclosers are circuit breakers attached to utility poles that send electrical pulses through

12

power lines when service is interrupted. The use of reclosers can prevent blackouts.

13

14

216.    It is widely recognized in the utility industry that reclosers can present a danger, such

15

as when vegetation has come into contact with a power line. In such a situation, sending electricity

16

though the line can present a fire hazard.

17

217.    The use of reclosers was one of the fire risks specifically noted by the Liberty Report.

18

218.    Other utilities operating in the State of California—specifically San Diego Gas &

19

Electric Co. and Southern California Edison—reprogram their reclosers during fire seasons to prevent

20

them from restarting automatically.

21

22

219.    The Company has the ability to similarly reprogram its reclosers. Defendant Hogan

23

acknowledged the cost/benefit tradeoff of using reclosers in his testimony before the California Senate

24

Sub-Committee on Gas, Electric, and Transportation Safety on November 18, 2015, stating that by

25

not using reclosers, "you take the reliability hit, but you gain the wildfire benefit."

26

27

28

220.    At the same hearing, Defendant Hogan asserted that the Company was "just about done" with a program to allow the Company to disable reclosers remotely. He assured the Committee that the project would be completed by the end of 2016.

221.    However, during the 2017 fire season, certain of the Company's lines in the area of the Wildfires were set to try and restart power between one and three times before locking down the lines if unsuccessful at restoring function.

222.    Regarding the Company's use of reclosers, California state Senator Jerry Hill has been quoted in a November 6, 2017 NBC article as stating: "I was under the opinion that they had the technology and used it the way Edison and San Diego Gas and Electric do . . . I think they misled me and the public."

223.    On January 3, 2018, NBC reported that Company officials stated that prior to the Wildfires, it had " only shut down 38 of the several thousand automated devices [reclosers] that some experts believe started the wildfires." The article quoted Senator Hill, stating, in relevant part:

> ***Hill said he was surprised the company's recloser shutdown was so limited, given that a top PG&E official assured him back in 2015 that the company would be able to shut down reclosers in all 132 of the high risk fire areas by the start of 2017***.

> "I think that's the troubling part," Hill said, "that they misled us in that.

> "Had they said they did not have that system in place, then we would have followed up with more questions to try to find what the problem was -- and may have been able to focus in on that a couple of years ago that may have prevented these fires in October."

(Emphasis added.)

## False and Misleading Statements

### April 29, 2015 Conference Call

224.    On April 29, 2015, the Company held a conference call with analysts and investors to discuss the Company's results for the quarter ended March 31, 2015. During that call, non-party Christopher Johns, President of the Utility at the time, stated that PG&E was "stepping up [its] vegetation management activities to mitigate wildfire risk."

*2015 Corporate Responsibility and Sustainability Report*

225.    On October 16, 2015, the Company published its 2015 Corporate Responsibility and Sustainability Report (the "2015 CSR"), which was authorized by Defendant Kane as the Company's Chief Ethics and Compliance Officer. Regarding the Company's vegetation management, the 2015 CSR stated, in relevant part:

> *Each year, PG&E's Vegetation Management department, in consultation with utility arborists and foresters, inspects every mile of power line in our service area* for public safety and electric reliability. *We do so in compliance with relevant laws* and with a focus on public involvement, including extensive "Right Tree, Right Place" outreach.

(Emphasis added.)

*Defendant Hogan's November 18, 2015 Testimony*

226.    As noted above, Defendant Hogan gave public testimony in front of the Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure Safety of the California Senate on November 18, 2015. Regarding the Company's progress on implementing a program to allow for disabling reclosers remotely, Defendant Hogan stated, in relevant part:

> So as I mentioned earlier, our SCADA capabilities *where we are able to take our reclosers out of service remotely, we first focus on the wildfire areas* and then we have about 130 some odd locations, we are going to complete about 126 of those this year, *just about done with that program*, which leaves six for next year, which will be completed.

(Emphasis added.)

*May 23, 2016 Press Release*

227.    On May 23, 2016, the Individual Defendants caused the Company to issue a press release announcing that the Company would be raising its common stock dividend. The press release further asserted that the Company was making continued progress on safety, stating, in relevant part:

> SAN FRANCISCO, Calif.—PG&E Corporation (NYSE: PCG) today announced that it is *raising its quarterly common stock dividend* to 49 cents per share, an increase of 3.5 cents per share, *beginning with dividends for the second quarter of 2016*.

> On an annual basis, this action increases PG&E Corporation's annual stock dividend by nearly 8 percent, from $1.82 per share to $1.96 per share. PG&E Corporation is targeting a payout ratio of 55 percent to 65 percent, with the intent of reaching approximately 60 percent by 2019.

The increase, which is the company's first in six years, is a meaningful step toward gradually returning the company's dividend payout to levels that are comparable with those of similar utilities.

* * *

The company highlighted these plans and the dividend increase this morning at its annual shareholder meeting in San Francisco. ***Earley and other senior executives also discussed continued progress on safety***, reliability and other goals, as well as PG&E's strategy for the future.

***Earley said, "We've continued to demonstrate leadership and commitment on safety.*** We're delivering the most reliable service in our company's history.

(Emphasis added.)

### *2016 Corporate Responsibility and Sustainability Report*

228.     On October 6, 2016, the Company published its 2016 Corporate Responsibility and Sustainability Report (the "2016 CSR"), which was authorized by Defendant Kane as the Company's Chief Ethics and Compliance Officer. Regarding the Company's vegetation management, the 2016 CSR stated, in relevant part:

***Each year, PG&E's Vegetation Management department and its contracting arborists and foresters inspect miles of power lines in our service area for public safety*** and electric reliability. ***We do so in compliance with relevant laws*** and with a focus on public involvement, including extensive "Right Tree, Right Place" outreach.

(Emphasis added.)

### *November 4, 2016 Conference Call*

229.     On November 4, 2016, the Company held a conference call with analysts and investors to discuss the Company's results for the quarter ended September 30, 2016. During that call, Defendant Earley stated, in relevant part:

***The improvements we have made in safety and reliability over the last six years have put us in a position to deliver strong financial results going forward.***

Earlier this year, we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019. Combined with our expected rate based growth, we are confident we can deliver a strong overall return for our shareholders.

(Emphasis added.)

### *May 31, 2017 Press Release*

230.    On May 31, 2017, the Individual Defendants caused the Company to issue a press release announcing that the Company would again be raising its common stock dividend. The press release further asserted that the Company was making continued progress on safety, stating, in relevant part:

> **SAN FRANCISCO, Calif.** – PG&E Corporation (NYSE: PCG) today announced that it is raising its quarterly common stock dividend by 4 cents per share to 53 cents per share, beginning with the dividend for the second quarter of 2017. On an annual basis, this action increases PG&E Corporation's dividend by 8 percent, from $1.96 per share to $2.12 per share.
>
> "This represents another significant step toward returning our dividend payout to levels in line with those of similar energy companies. ***Offering a comparable dividend positions PG&E to more cost-effectively raise capital to support continued major investments in safety***, reliability and clean energy on behalf of our customers," said PG&E Corporation CEO and President Geisha Williams.
>
> * * *
>
> Yesterday, in remarks at the joint annual shareholders meeting of PG&E Corporation and Pacific Gas and Electric Company, [Defendant] Williams highlighted ***the companies' progress on safety***, reliability and reducing greenhouse gas emissions, among other accomplishments. ***She reaffirmed PG&E's commitment to safety and operational excellence***, delivering for customers and leading the way to achieve California's clean energy goals.

(Bold emphasis in original. Bold & Italic emphasis added.)

### *2017 Corporate Responsibility and Sustainability Report*

231.    On August 9, 2017, the Company published the 2017 Corporate Responsibility and Sustainability Report (the "2017 CSR"), which was authorized by Defendant Kane as the Company's Chief Ethics and Compliance Officer. Regarding the Company's vegetation management, the 2017 CSR stated, in relevant part:

> ***PG&E prunes and removes trees growing too close to power lines*** while maintaining as much vegetation as possible to balance land use and environmental stewardship with customer needs. Through a well-established and innovative vegetation management program, ***PG&E balances the need to maintain a vast system of trees growing along power lines while complying with state and federal regulations and delivering safe***, reliable and affordable ***electric service***. All work includes steps to protect water and air quality, as well as endangered species and habitats.

(Emphasis added.)

### *Currents – PG&E's News Website*

232.    The Individual Defendants caused the Company to maintain a news webpage titled "Currents" at all relevant times.[12] Currents publishes news and other information regarding the Company's activities, including, but not limited to, the operation, safety, and maintenance of the Company's electric transmission and distribution facilities. Numerous statements regarding the purported safety of the Company's electric transmission and distribution network, as well as the Company's allegedly proactive approach to addressing the risk of wildfires can be found on the Currents webpage.

233.    The statements in ¶¶ 224-232 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) the Company failed to comply with state safety requirements and regulations in maintaining its transmission and distribution networks; (2) as a result of the foregoing, the Company was in violation of such state laws and regulations; (3) the Company had made less progress on safety enhancements, and in particular, wildfire safety enhancements, than it had represented; (4) the Company's electricity transmission and distribution networks could foreseeably, and ultimately did, cause a number of wildfires in the State of California due, at least in part, to the Company's failures of regulatory compliance; (5) as a result of the Company's safety issues, the Company's dividend was not as secure as the Individual Defendants had led the market to believe; (6) the Company failed to maintain internal controls; and (7) due to the foregoing, Defendants' statements regarding the Company's business, operations, regulatory compliance and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

***2017 Proxy Statement***

---

[12] http://www.pgecurrents.com/. Last visited November 16, 2018.

Verified Shareholder Derivative and Double Derivative Complaint

234.     PG&E and the Utility filed their joint 2017 Proxy Statement with the SEC on April 18, 2017. Defendants Chew, Earley, Fowler, Johnson, Kelly, Kimmel, Meserve, Miller Mullins, Parra, Rambo, Smith, Stavropoulos, and Williams solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[13]

235.     Regarding "Risk Management," the 2017 Proxy Statement stated, in relevant part:

PG&E Corporation and the Utility continue to review and refine the approach to the companies' risk management programs. In 2011, the companies expanded their Enterprise Risk Management program to examine all enterprise and operational company risks, and to increase Board review of risk management. The program was renamed as the Enterprise and Operational Risk Management ("EORM") program in 2013 to reflect its expanded scope. At that time, risk management was integrated into the companies' planning and budgeting process, which leads to the identification of specific enterprise risks for review and oversight by the Corporation and Utility Boards.

As described below, *the companies' risk management governance structures allow risks to be investigated both under a Board-directed review process and also from a "bottoms-up" approach that allows operational experts to add their knowledge and identify emerging issues for the companies*.

(Emphasis added.)

236.     The 2017 Proxy Statement then outlined Board-Level Duties, stating, in relevant part:

As part of their oversight functions, the Boards generally oversee the companies' risk management policies and programs; however, management has day-to-day responsibility for assessing and managing exposure to various risks. *Enterprise risks are reviewed annually by the Boards' Audit Committees, and oversight for specific risk categories is allocated to various Board committees, consistent with the substantive scope of each committee's charter. Each such committee provides a report of its activities to the applicable Board.*

The Boards and their respective committees have specific oversight responsibility for risk management in the following areas:

•         The Boards evaluate risks associated with major investments and strategic initiatives, with assistance from the Finance Committee.

---

[13] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

- Each company's ***Audit Committee discusses the guidelines and policies that govern the processes for assessing and managing major risks*** (including the EORM program that is discussed in more detail below), allocates to other Board committees the specific responsibility to oversee identified enterprise risks, generally oversees regulatory and legal compliance risks, and considers risk issues associated with overall financial reporting and disclosure processes.

- The Finance Committee discusses risk exposures related to energy procurement, including energy commodities and derivatives, and other enterprise risks, as assigned by the Audit Committees.

- ***The Nuclear, Operations, and Safety Committee discusses risks related to the safety of the Utility's*** nuclear, ***electric, gas, and other operations and facilities, and oversees other enterprise risks, as assigned by the Audit Committees***.

(Emphasis added.)

237.    The 2017 Proxy Statement stated, regarding "Compliance and Ethics," that:

During 2015, as part of PG&E Corporation's and the Utility's commitment to strengthen their compliance and ethics program and performance, the companies restructured the governance for managing compliance and ethics to highlight and delineate more clearly the responsibilities for the implementation, coordination, and monitoring of their compliance and ethics program.

Board-level oversight is shared by the Boards and their committees. ***The Audit Committees generally assist the Boards with monitoring and overseeing compliance with legal and regulatory requirements, including discussing with management the companies' programs to monitor non-compliance with laws, regulations, and internal policies and standards***. ***The Compliance and Public Policy Committee provides further assistance for these Board-level oversight duties, including overseeing and evaluating the effectiveness of the companies' compliance programs, reviewing periodic reports from management regarding compliance status and potential issues, and monitoring that a consistent commitment to effective compliance programs is conveyed to employees, contractors, and other relevant stakeholders. The Audit Committees also specifically review legal and regulatory matters that may impact the companies' financial statements. The Nuclear, Operations, and Safety Committee reviews significant compliance issues related to the Utility's nuclear, generation, gas and electric transmission, and gas and electric distribution operations and facilities***.

This compliance governance structure helps promote a consistent approach to compliance and ethics across Board committees and the companies***. The Compliance and Public Policy Committee works with management to make sure that the appropriate reports and materials regarding compliance and ethics issues are reviewed and discussed on a regular basis***. The Audit Committees, the Compliance and Public Policy Committee, and the Nuclear, Operations, and Safety Committee meet jointly at least annually to coordinate and discuss the companies' compliance program and monitor that all significant compliance and ethics issues are addressed by the appropriate Board committees.

At the management level, the companies' Chief Ethics and Compliance Officer (CECO), in partnership with the lines of business, has day-to-day responsibility for overseeing and monitoring the company-wide compliance and ethics program. The lines of business are responsible for program implementation, and regularly report to the CECO on compliance matters. Management also has established a senior officer compliance and ethics committee that provides strategic guidance on, and oversight of, the compliance and ethics program, including the programs and systems designed to prevent, detect, and mitigate non-compliance. The CECO also leads the companies' ethics and compliance training and culture-building efforts.

(Emphasis added.)

238.    The 2017 Proxy Statement stated, regarding the Code of Conduct and Director Code of Conduct, that:

Current copies of the following codes of conduct, applicable to both companies, are available online through the Compliance and Ethics section of PG&E Corporation's website *(www.pgecorp.com/aboutus/ethics_compliance/index.shtml)* or the Company Information section of the Utility's website (*https://www.pge.com/en_US/about-pge/company-information/company-information.page*, under the "Visit Compliance and Ethics" icon), as appropriate.

239.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its compliance and ethics programs had not been strengthened and its Code of Conduct and Director Code of Conduct were not followed, as evidenced by the numerous false and misleading statements alleged herein, the conclusions of state regulators that the Company's violations of state laws and regulations led to the Wildfires, discussed below, and the insider trading engaged in by five of the Individual Defendants.

240.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay for performance" elements, including an "equity-based incentive plan is designed to link executive performance to long-term shareholder returns" that is "measured by stock price appreciation and dividends paid" while failing to disclose that the Company's share price, and therefore shareholder returns, were artificially inflated as a result of false and misleading statements alleged herein.

241.   The 2017 Proxy Statement also failed to disclose that: (1) the Company failed to comply with state safety requirements and regulations in maintaining its transmission and distribution networks; (2) as a result of the foregoing, the Company was in violation of such state laws and regulations; (3) the Company had made less progress on safety enhancements, and in particular, wildfire safety enhancements, than it had represented; (4) the Company's electricity transmission and distribution networks could foreseeably, and ultimately did, cause a number of wildfires in the State of California, due, at least in part, to the Company's failures of regulatory compliance; (5) as a result of the Company's safety issues, the Company's dividend was not as secure as the Individual Defendants had led the market to believe; (6) the Company failed to maintain internal controls; and (7) due to the foregoing, Defendants' statements regarding the Company's business, operations, regulatory compliance and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

**The Truth Begins to Emerge**

242.   The Wildfires started in the State of California on or about October 8, 2017. Ultimately, these fires led to 240,000 acres or more of land being burned. Properties in the counties of Butte, Humboldt, Lake, Mendocino, Napa, Santa Rosa, Solano, and Sonoma sustained major damage as a result of the fires.

243.   Media sources began reporting, on or about October 11, 2017, that authorities and officials in the State of California were investigating whether the fires were caused by PG&E's power lines.

244.   For example, an October 13, 2017 report from *Reuters* stated:

Shares of PG&E (PCG.N) fell for the third straight day on Friday on investor concerns the company may have to pay damages after authorities suggested power lines toppled by strong winds may have sparked the worst wildfire in California's history.

Flames erupted on Sunday night, gaining strength over the week. The exact cause of the disaster is under investigation.

Shares of the California-based utility fell as much as 13 percent on Friday to $56.32 on the New York Stock Exchange.

"While it is too early to determine the utility's responsibility, it is possible that shareholders will bear responsibility for some damages," RBC Capital Markets analyst Shelby Tucker said, cutting her price target on the company's stock by $2 to $68.

The analyst said even if the company is insured for damages, it would still be financially responsible for harm to property and could be sued for damages.

"The extent of damages possible under negligence are far higher since they include personal injury damages, among others," Tucker said.

PG&E has been investigated by California's department of Forestry and fire protection earlier too.

According to media reports, a 2015 investigation found that a power line operated by the utility ignited fires that burned more than 70,000 acres.

Shares of PG&E have fallen nearly 20 percent since Wednesday, when officials said electric wires knocked down by winds could have caused the fire.

The utility's shares were trading at $59.33 on late Friday morning.

245.    On October 13, 2018, analysts, including Wells Fargo and Guggenheim, linked declines in the Company's stock price to concern over the Company's responsibility for the Wildfires.

246.    The same day, the Company filed a Form 8-K with the SEC, announcing that the Wildfires were under investigation and speculating as to the possible effects on the Company:

Since October 8, 2017, several catastrophic wildfires have started and remain active in Northern California. *The causes of these fires are being investigated by the California Department of Forestry and Fire Protection (Cal Fire), including the possible role of power lines and other facilities of Pacific Gas and Electric Company's (the "Utility"), a subsidiary of PG&E Corporation*.

It currently is unknown whether the Utility would have any liability associated with these fires. *The Utility has approximately $800 million in liability insurance for potential losses that may result from these fires. If the amount of insurance is insufficient to cover the Utility's liability or if insurance is otherwise unavailable, PG&E Corporation's and the Utility's financial condition or results of operations could be materially affected*.

(Emphasis added.)

247.    The CPUC sent the Company a litigation hold letter, which ordered the Company to preserve all evidence related to the Wildfires, including physical equipment and documents, on October 12, 2017.

248.    On this news, price per share of PG&E stock steadily declined from a close of $69.19 per share on October 10, 2017 to close at $53.43 per share on October 16, 2017 -- a drop of 22.2%, or $15.22. The following chart illustrates the change in PG&E's share price between October 10 and October 16, 2017:

| Date | Closing Price | % Decline from Previous Day's Close | % Decline From October 10, 2017 |
|------|--------------|--------------------------------------|----------------------------------|
| 10/11/2017 | $   69.15 | 0.1% | 0.1% |
| 10/12/2017 | $   64.50 | 6.7% | 6.8% |
| 10/13/2017 | $   57.72 | 10.5% | 16.6% |
| 10/16/2017 | $   53.43 | 7.4% | 22.8% |

**False and Misleading Statements Continue while the Truth Continues to Emerge**

***October 31, 2017 Currents Post***

249.    On October 31, 2017, the Individual Defendants caused the Company to publish a post on the Company's Currents website release providing information on the Company's vegetation management efforts. The post stated, in relevant part: "PG&E follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation."

***November 2, 2017 Conference Call***

250.    On November 7, 2017, the Company held a conference call with analysts and investors to discuss the Company's results for the quarter ended September 30, 2017. During that call, Defendant Williams made a number of statements regarding the Company's vegetation management programs, including, in relevant part:

> Many of you have reached out with questions about the potential impact of the wildfires to the company's financials and also about the doctrine of inverse condemnation in California. At this time, the known financial impact of the wildfires is limited to the cost of the unprecedented response and restoration efforts, costs related to our liability insurance and some legal expenses, and Jason [Wells] will cover these later this morning.

* * *

*I know there's a lot of interest in our pole maintenance and vegetation management programs*, so let me address these as well. First, *we routinely inspect, maintain and replace our electric poles. This includes annual scheduled patrols, 5-year visual inspections, an intrusive testing and treating on our wood poles on a frequency that significantly exceeds CPUC requirements.*

*We also have one of, if not, the most comprehensive vegetation management programs in the country*. Our vegetation management program manages about 123 million trees across the service territory. And every year, we inspect every segment of the 99,000 miles of overhead line and we clear vegetation as needed. This is well beyond what is typical in our industry where most utilities have a 3-year vegetation management cycle or sometimes longer. *Typically, we spend about $200 million every year to line clear or remove 1.3 million trees to mitigate both the risk of wildfires and to prevent electric outages. With the drought and the tree mortality crisis we've experienced in California, we have been expanding our vegetation management work since 2014*.

*In 2016, we spent an additional $200 million, essentially doubling our typical vegetation management spending last year*. We've removed an incremental 236,000 dead or dying trees, and we enhanced our tree maintenance work with additional patrols in areas of high fire danger, including a combination of boots on the ground, aerial patrols, and sophisticated LiDAR technology.

(Emphasis added.)

251.    Later, in response to an analyst's question about the Company's vegetation management practices for trees located near power lines, Defendant Stavropoulos repeated Defendant Williams' assertion that the Company had substantially increased its spending on vegetation management, stating, in relevant part:

So, as Geisha mentioned, we have a very aggressive vegetation management program across our 70,000-mile -- square mile territory. We manage about 123 million trees that are near and adjacent to our facilities. And *over the last 2 years, we've doubled the amount that we've invested in veg[etation] management*. That includes line clearing to remove parts of trees that are adjacent to our facilities as well as removal of dead and dying trees. So, the program involves year-round effort to identify these dead and dying trees through inspection processes where we use foot and aerial patrols; we use LiDAR, which is light, detecting and ranging technology, to identify the trees that need to be worked. *We inspect all of our overhead lines every year, and we do second patrols in high fire danger areas at least twice a year. In some areas, we do as often as 4 times a year.* So, it's a very aggressive program. There are specific requirements around line clearing, and it depends upon the voltage of the lines. And it can range up to feet [sic] to as much a sort of 18 inches away from the facility. So, there are all sorts of different requirements, depending upon where the facilities are located and the voltage of the facilities.

(Emphasis added.)

*November 5, 2017 Currents Post*

73

252.    On November 5, 2017, the Individual Defendants caused the Company to publish a post on the Company's Currents website release providing information on the Company's Wildfire and Prevention Safety Efforts. The post stated, in relevant part: "PG&E meets or exceeds all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines and procedures to reduce outages or fires caused by trees or other vegetation."

### December 20, 2017 Press Release

253.    The Company issued a press release on December 20, 2017, titled "PG&E Announces Suspension of Dividend, Citing Uncertainty Related to Causes and Potential Liabilities Associated with Northern California Wildfires." The press release was also filed with the SEC after markets closed on December 20, 2017 as an attachment to a Form 8-K. The press release stated:

PG&E Corporation (NYSE: PCG) *today announced that its Board of Directors has determined to suspend the quarterly cash dividend on the Corporation's common stock, beginning with the fourth quarter of 2017, citing uncertainty related to causes and potential liabilities associated with the extraordinary October 2017 Northern California wildfires*.

In addition, *the Board of Directors of the Corporation's utility subsidiary, Pacific Gas and Electric Company, determined to suspend the dividend on the utility's preferred stock, beginning with the three-month period ending Jan. 31, 2018, citing the same uncertainty*.

No causes have yet been identified for any of the unprecedented wildfires, which continue to be the subject of ongoing investigations.

However, California is one of the only states in the country in which courts have applied inverse condemnation to events caused by utility equipment. This means that if a utility's equipment is found to have been a substantial cause of the damage in an event such as a wildfire – even if the utility has followed established inspection and safety rules – the utility may still be liable for property damages and attorneys' fees associated with that event.

"*After extensive consideration and in light of the uncertainty associated with the causes and potential liabilities associated with these wildfires as well as state policy uncertainties, the PG&E boards determined that suspending the common and preferred stock dividends is prudent with respect to cash conservation and is in the best long-term interests of the companies, our customers and our shareholders," said PG&E Corporation Chair of the Board Richard C. Kelly*.

"We fully recognize the importance of dividends and intend to revisit the issue as we

get more clarity. In the meantime, PG&E is committed to working with state policymakers to address the negative investment environment that strict liability under inverse condemnation is creating for California's utilities. This ultimately hurts our customers and the state. The company also remains committed to supporting recovery and rebuilding efforts by those communities that were impacted by these devastating fires," he said.

(Emphasis added.)

254. On this news, price per share of PG&E stock fell from a close of $51.12 per share on December 20, 2017 to close at $44.50 per share on December 21, 2017 -- a drop of over 12.9%, or $6.62.

255. Analysts, including RBC Capital Markets, linked the dividend suspension to a greater risk of adverse regulatory action in connection with the Wildfires.

256. CAL FIRE issued a press release on May 25, 2018, titled "CAL FIRE Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties." The press release stated, in relevant part:

After extensive and thorough investigations, *CAL FIRE investigators have determined that four Northern California wildfires in last year's October Fire Siege were caused by trees coming into contact with power lines*. The four fires, located in Butte and Nevada counties, are the first fire investigations from last October to be completed.

CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. The Department continues to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed.

The October 2017 Fire Siege involved more than 170 fires and charred more than 245,000 acres in Northern California. More than 11,000 firefighters from 17 states helped battle the blazes.

(Emphasis added.)

257. The press release continued, providing the following summary of the four completed investigations:

• The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.

• The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. There were no injuries to civilians or firefighters. *CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293*.

• The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters. *CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated*.

• The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. *CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. The investigation found evidence that Public Resources Code 4293, which requires adequate clearance between trees and power lines, was allegedly violated*.

*The McCourtney, Lobo, Honey investigations have been referred to the appropriate county District Attorney's offices for review*.

(Emphasis added.)

258.    The Individual Defendants caused the Company to issue a press release on May 25, 2018 responding to CAL FIRE's press release issued the same day. The press release stated, in relevant part:

Following Governor Brown's January 2014 Drought State of Emergency Proclamation and the California Public Utilities Commission's Resolution ESRB-4, PG&E has added enhanced measures to address areas particularly affected by drought and bark beetles including:

- Increased foot and aerial patrols along power lines in high fire-risk areas;

- Removed approximately 236,000 dead or dying trees in 2016 and 140,000 dead or dying trees in 2017; these tree removals were in addition to approximately 30,000 trees removed per year prior to the drought;

- Launched daily aerial fire detection patrols during high fire season to improve fire spotting and speed of fire response;

- Since 2014, provided $11.4 million to local Fire Safe Councils (FSCs) for fuel reduction projects in communities; and

- Provided $1.7 million to local FSCs for 28 highly programmable remote-sensing cameras for critical fire lookout towers.

*PG&E meets or exceeds regulatory requirements for pole integrity management*, using a comprehensive database to manage multiple patrol and inspection schedules of our more than two million poles.

259.   On this news, price per share of PG&E stock fell from a close of $44.66 per share on May 25, 2018 to close at $42.34 per share on the following trading day, May 29, 2018[14] -- a drop of approximately 5.2%, or $2.32.

260.   The statements in ¶¶ 249-253 and 258 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) the Company failed to comply with state safety requirements and regulations in maintaining its transmission and distribution networks; (2) as a result of the foregoing, the Company was in violation of such state laws and regulations; (3) the Company had made less progress on safety enhancements, and in particular, wildfire safety enhancements, than it had represented; (4) the Company did not double its typical vegetation management spending in 2016; (5) the Company's electricity transmission and distribution networks could foreseeably, and ultimately did, cause a number of wildfires in the State of California, due, at least in part, to the Company's failures of regulatory compliance; (6) as a result of the Company's safety issues, the Company's dividend was not as secure as the Individual Defendants had led the market to believe; (7) the Company failed to maintain internal controls; and (8) due to the foregoing, Defendants' statements regarding the Company's business, operations, regulatory compliance and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

261.   Following the publication of the results of CAL FIRE's investigations, analysts commented that the results were likely negative news for PG&E. A May 29, 2018 Citigroup report

---

[14] Markets were closed on May 28, 2018 in observance of Memorial Day.

Verified Shareholder Derivative and Double Derivative Complaint

asserted that the CAL FIRE reports "will support 'causation' and likely lead to [the Company] bearing the liability for damages under Inverse Condemnation," even going so far as to suggest that the Company might be liable for "Gross Negligence."

262.    CAL FIRE issued another press release after markets closed on June 8, 2018, titled "CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties." The press release stated, in relevant part:

> After extensive and thorough investigations, ***CAL FIRE investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors and the failure of power poles***.
>
> The October 2017 Fire Siege involved more than 170 fires and burned at least 245,000 acres in Northern California. About 11,000 firefighters from 17 states and Australia helped battle the blazes.
>
> CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. CAL FIRE investigators continue to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed. The cause of four Northern California fires were <u>released on May 25</u>.

(Underline in original, bold and italic emphasis added.)

263.    The press release continued, providing the following summary of the completed investigations:

> The **Redwood Fire**, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. CAL FIRE has determined the fire started in two locations and was caused by tree or parts of trees falling onto PG&E power lines.
>
> The **Sulphur Fire**, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. ***CAL FIRE investigators determined the fire was caused by the failure of a PG&E owned power pole, resulting in the power lines and equipment coming in contact with the ground***.
>
> The **Cherokee Fire**, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was a result of tree limbs coming into contact with PG&E power lines.
>
> The **37 Fire**, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was electrical and was associated with the PG&E distribution lines in the area.

78

The **Blue Fire**, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. ***CAL FIRE investigators have determined a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire***.

(Bold emphasis in original, bold and italic emphasis added.)

264.    The Press release continued, stating:

The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.

CAL FIRE investigators determined the **Norrbom Fire** was caused by a tree falling and coming in contact with PG&E power lines.

CAL FIRE investigators determined the **Adobe Fire** was caused by a eucalyptus tree falling into a PG&E powerline.

CAL FIRE investigators determined the **Partrick Fire** was caused by an oak tree falling into PG&E powerlines.

CAL FIRE investigators determined the **Pythian Fire** *was caused by a downed powerline after PG&E attempted to reenergize the line*[.]

CAL FIRE investigators determined the **Nuns Fire** was caused by a broken top of a tree coming in contact with a power line.

The **Pocket Fire**, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. CAL FIRE has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines.

The **Atlas Fire**, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. CAL FIRE investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line.

(Bold emphasis in original, bold and italic emphasis added.)

265.    Regarding violations of state law found to have been committed by the Company, the press release stated, in relevant part:

***CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires – Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas – due to evidence of alleged violations of state law***.

(Emphasis added.)

266.   The following day, Saturday, June 9, 2018, *Bloomberg* published an article revealing the possibility that the Company might face criminal charges in connection with the Wildfires. Discussing the State of California's claim to have "found evidence of violations of law by PG&E in connection with eight of the blazes," the article stated, in relevant part:

> That evidence -- which California's fire agency has now sent to county prosecutors -- could make or break PG&E in the dozens of lawsuits over the Northern California fires that altogether killed 44 people, consumed thousands of homes and racked up an estimated $10 billion in damages. The alleged violations could also expose PG&E to criminal charges only two years after the San Francisco company was convicted of breaking safety rules that led to a deadly gas pipeline explosion in San Bruno, California.

267.   The *Bloomberg* article included the following statement from PG&E: that "it continues to believe 'our overall programs met our state's high standards . . . .'"

268.   On June 10, 2018, J.P. Morgan, Deutsche Bank and Guggenheim issued reports concluding that the CAL FIRE findings were a negative development for PG&E, with Guggenheim describing the referral of evidence to the relevant District Attorney's offices as "likely a strong indictment to potential criminal and civil cases/lawsuits against the company."

269.   On June 11, 2018, before markets opened, the Company filed a Form 8-K with the SEC, admitting that it expected to be subject to significant liability for at least some of the Wildfires. The Form 8-K stated, in relevant part:

> Although the Utility's analysis is ongoing regarding the fires that were the subject of the June 8, 2018 and May 25, 2018 CAL FIRE news releases:
>
> - *for the La Porte, McCourtney, Lobo, Honey, Redwood, Sulphur, Cherokee, Blue, Pocket and Sonoma/Napa merged fires* (which include Nuns, Norrbom, Adobe, Partrick and Pythian), based on the current state of the law on inverse condemnation, the information currently available to the Utility, and the CAL FIRE determinations of cause, *PG&E Corporation and the Utility currently expect that they will record a significant liability for losses associated with such fires* in PG&E Corporation and the Utility's condensed consolidated financial statements to be included in their Form 10-Q for the quarterly period ending June 30, 2018 (the "Q2 financial statements"); and
>
> - *for the Atlas and Highway 37 fires*, PG&E Corporation and the Utility do not believe a loss is probable at this time, given the information currently available.

However, ***it is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable***, resulting in the accrual of a liability in the future, the amount of which could be significant.

(Emphasis added.)

270.    On June 11, 2018, *Bloomberg* published another article regarding the Company, reporting that it "said Monday it expects to record a 'significant liability' for fires, and the shares plunged the most in five months at the open." The article further commented that "[t]he alleged violations could also expose PG&E to criminal charges only two years after the San Francisco company was convicted of breaking safety rules that led to a deadly gas pipeline explosion in San Bruno, California."

271.    On this news, price per share of PG&E stock fell from a close of $41.45 per share on June 8, 2018 to close at $39.76 per share on the following trading day, June 11, 2018 -- a drop of approximately 4.1%, or $5.76.

272.    The Company's 2018 Corporate Responsibility and Sustainability Report (the "2018 CSR"), which is undated, does not represent that the Company is in compliance with laws regarding vegetation management. This is a marked change from assertions in the 2015, 2016, and 2017 CSRs, quoted above.  Instead, the 2018 CSR states, in relevant part:

As part of our Community Wildfire Safety Program, implemented in 2017 following the wildfires throughout the state, PG&E is working with our communities to put in place new and enhanced precautionary measures intended to help reduce wildfire risks and keep customers safe. This includes enhanced vegetation management to meet new vegetation and fire safety standards that require keeping trees and limbs farther away from power lines.

In December 2017, the CPUC adopted new regulations that require four feet minimum clearance year-round in high fire-threat areas. In some communities, that is an increase from the previous minimum requirement of 1.5 feet. Meeting the CPUC minimum clearance requirement at all times will require creating clearances of 12 feet or more at many locations to ensure compliance until the next inspection.

Beyond the new clearance requirements, PG&E will also work with communities and customers in high fire-threat areas to reduce vegetation and brush that can act as fuel in case of a wildfire from 15 feet or more on either side of power lines. This work will increase defensible space in our communities and improve access for firefighters responding to wildfires.

Verified Shareholder Derivative and Double Derivative Complaint

273.   PG&E shut off electricity for almost 60,000 customers in Northern California in October 2018 due to fire risk. This action constituted an implicit acknowledgment that such a drastic measure was necessary to prevent a repeat of the 2017 fire season. Paul Doherty, speaking on behalf of the Company regarding the shut offs, stated "[w]e're adapting our electric system our operating practices to improve safety and reliability. That's really the bottom line for us."

274.   In the days leading up to November 8, 2018, the Company issued a number of press releases announcing the possibility that it might need to shut off power in a number of areas, including Butte County, on November 8, 2018, due to weather and fire conditions.

275.   The Company tweeted at 6:14 PM on November 8, 2018 that it had elected not to proceed with the shutoff because "weather conditions did not warrant this safety measure."

276.   The Camp Fire, another record breaking fire, was ignited in Butte County on November 8, 2018, named for Camp Creek Road, where the fire originated. The Camp Fire has grown to become the deadliest and most destructive fire in California's history.

277.   As reported by *The Mercury News*, "[a]bout 48 hours before the fire started, the utility had been warning multiple counties, including Butte, that it would possibly shut down power Thursday morning due to dangerous fire weather conditions."

278.   *The Mercury News* has further reported that Betsy Ann Cowley, a homeowner in the area where the Camp Fire originated, received an email from PG&E on November 7, 2018, indicating that it would "be coming out to work on one of their nearby towers that 'were having problems with sparks.'" The Company denies that the email asserted that the line was sparking.

279.   Just before the Camp Fire was ignited, PG&E informed state regulators that a high-voltage power line near the Camp Fire's point of origin had a problem. The Company has asserted that this was a different line than the one that Betsy Ann Cowley was emailed about.

280.     Initial attack firefighters were dispatched to a report of a brush fire under PG&E power lines near Poe Dam on the Feather River shortly after the ignition of the Camp Fire.

281.     *The Mercury News* has reported that "[f]irefighters found downed power lines and a fast-moving fire beneath high-tension wires when they arrived Thursday at the fire's origin about a mile northeast of Pulga." Regarding the genesis of the fire and potential investigations, *The Mercury News* stated, in relevant part:

> "I've continuously tried to get in touch with them but nobody is in charge and they suck at communication," [Cowley] said of PG&E workers who handle nearby transmission lines. ***The lines, she said, have been ignored for years***, except for herds of goats on the slope chewing away vegetation under the lines.
>
> ***Radio transmissions from the first firefighters on the scene said it was managed vegetation area that was on fire initially***, but high winds blew the flames to nearby brush and timber.
>
> Michael Flautt, who often testifies as an electrical accident expert in court, said he would look at whether an equipment problem led to the malfunction in the 115 kV Caribou-Palermo transmission line.
>
> "They should check if the equipment at the original source was not set up properly for a short or a ground fault," Flautt said, stressing that he had not viewed the equipment and was offering his expert opinion. "You'd rather have the equipment trip, rather than catch fire."

(Emphasis added.)

282.     The article continued, discussing the ongoing use of reclosers by PG&E:

> In March, PG&E said that during high winds it would periodically disable automated devices that can allow electrical power to continue flowing despite minor disruptions on the transmission or residential power lines. Other utilities shut down that equipment during high winds because if wires come down, they continue sending currents and could ignite vegetation on the ground.
>
> ***In response to a question about whether those automated devices, called reclosers, were disabled in the area of the transmission line malfunction, PG&E issued the following statement***:
>
> "***Nothing is more important than the safety of our customers, employees, contractors and the communities we serve***," said spokesman Paul Doherty. "The cause of the Camp Fire has not yet been determined. Right now, our entire company is focused on supporting first responders and assisting our customers and communities impacted by the Camp Fire."

(Emphasis added.)

283.    On November 12, 2018, the CPUC announced it had launched an investigation into PG&E's regulatory compliance related to the Camp Fire.

284.    On this news, price per share of PG&E stock fell from a close of $39.92 per share on November 9, 2018 to close at $32.98 per share on the following trading day, November 12, 2018 -- a drop of approximately 16.5%, or $7.88.

285.    On November 13, 2018, the Company filed a Form 8-K with the SEC discussing, *inter alia*, the Camp Fire. The Form 8-K revealed that one of the Company's transmission towers in the Camp Fire area had been observed as damaged on the afternoon of November 8, 2018, stating, in relevant part:

> On November 8, 2018, a wildfire began near the city of Paradise, Butte County, California (the "Camp Fire"), located in the service territory of the Utility. The California Department of Forestry and Fire Protection's ("Cal Fire") Camp Fire Incident Report dated November 13, 2018, 7:00 a.m. Pacific Time (the "incident report"), indicated that the Camp Fire had consumed 125,000 acres and was 30% contained. Cal Fire estimates in the incident report that the Camp Fire will be fully contained on November 30, 2018. In the incident report, Cal Fire reported 42 fatalities. The incident report also indicates the following: structures threatened, 15,500; single residences destroyed, 6,522; single residences damaged, 75; multiple residences destroyed, 85; commercial structures destroyed, 260; commercial structures damaged, 32; and other minor structures destroyed, 772.

> The cause of the Camp Fire is under investigation. ***On November 8, 2018, the Utility submitted an electric incident report to the California Public Utilities Commission (the "CPUC") indicating that "on November 8, 2018 at approximately 0615 hours, PG&E experienced an outage on the Caribou-Palermo 115 kV Transmission line in Butte County. In the afternoon of November 8, PG&E observed by aerial patrol damage to a transmission tower on the Caribou-Palermo 115 kV Transmission line, approximately one mile north-east of the town of Pulga, in the area of the Camp Fire***. This information is preliminary." Also on November 8, 2018, acting governor Gavin Newsom issued an emergency proclamation for Butte County, due to the effect of the Camp Fire.

> As previously reported, during the third quarter of 2018, PG&E Corporation and the Utility renewed their liability insurance coverage for wildfire events in an aggregate amount of approximately $1.4 billion for the period from August 1, 2018 through July 31, 2018. For more information about wildfire insurance and risks associated with wildfires, see PG&E Corporation and the Utility's quarterly report on Form 10-Q for the quarter ended September 30, 2018.

> While the cause of the Camp Fire is still under investigation***, if the Utility's equipment is determined to be the cause, the Utility could be subject to significant liability in excess of insurance coverage that would be expected to have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations,***

84

*liquidity, and cash flows.*

(Emphasis added.)

286. As evidenced by the estimated $17 billion in damages caused by the Wildfires, damages from the Camp Fire will likely exceed the Company's $1.4 billion insurance policy.

287. The November 13, 2018 Form 8-K further revealed that both PG&E and the Utility had exhausted their revolving credit facilities.

288. Also on November 13, 2018, a suit was filed against the Company by several victims of the Camp Fire in San Francisco County Superior Court. The suit alleges that the Company failed to maintain its infrastructure and equipment, leading to the Camp Fire. The suit further alleges that the Camp Fire arose from a flawed corporate culture.

289. On this news, price per share of PG&E stock fell from a close of $32.72 per share on November 13, 2018 to close at $25.59 on November 14, 2018 – a drop of approximately 21.8%, or $7.13.

290. As of November 15, 2018, the Camp Fire had destroyed nearly 12,000 structures, and was reported to be responsible for over 60 deaths and hundreds of missing persons. The Company will be subject to significant liability as a result of the damages sustained by those who were injured, killed, or suffered property damage as a result of the Camp Fire.

## DAMAGES TO PG&E

291. As a direct and proximate result of the Individual Defendants' conduct, the Company has lost and will continue to lose and expend many millions of dollars.

292. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against PG&E and its former President and CEO, its current President and CEO, its Chief Ethics and Compliance Officer, the Utility, a former President, COO and board member of the Utility, another former President of the Utility, and the Utility's Senior Vice President

of Electric Operations, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

293.   Such expenditures include, but are not limited to, legal fees associated with the Camp Fire, including any damages should the Company be found responsible for the Camp Fire, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

294.   Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

295.   As a direct and proximate result of the Individual Defendants' conduct, PG&E has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

296.   Plaintiff brings this action derivatively and for the benefit of the Company to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of PG&E and/or the Utility, unjust enrichment, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

297.   PG&E and the Utility are named solely as nominal parties in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

298.   Plaintiff is, and has been at all relevant times, a shareholder of PG&E. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

299.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

300.    A pre-suit demand on the Board of the Company is futile and, therefore, excused. At the time of filing of this action, the Boards of PG&E and the Utility consist of the following 12 individuals:  Individual Defendants Chew, Fowler, Kelly, Kimmel, Meserve, Miller, Mullins, Parra, Rambo, Smith, and Williams (the "Director-Defendants"), and non-party Benito Minicucci (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the 12 Directors who are on the Boards at the time this action is commenced.

301.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while one of them engaged in insider sales based on material non-public information, netting proceeds of approximately $823,635, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

302.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

303.     The Directors knew of the falsity of the misleading statements at the time they were made. The operation of energy production, distribution, and transmission is the core operation of the Company.

304.     As members of the Company's Boards, charged with overseeing the Company's affairs, Director-Defendants Chew, Fowler, Kelly, Kimmel, Meserve, Miller, Mullins, Parra, Rambo, Smith, and Williams all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims, as well as the relevant laws and regulations governing the distribution and transmission of electricity. Specifically, as members of the Company's Boards, Defendants Chew, Fowler, Kelly, Kimmel, Meserve, Miller, Mullins, Parra, Rambo, Smith, and Williams must have been aware of the material facts surrounding the state of the Company's transmission and distribution infrastructure, especially in light of the Company's track record of safety incidents involving fires.

305.     For example, several of the Director-Defendants were on the Boards when the Company's equipment sparked prior fires, including the Rancho Cordova, San Bruno, and Butte Incidents. Defendants Meserve and Rambo were on the Boards through all three Incidents. Defendants Chew, Kimmel and Miller were on the Boards at the time of the San Bruno Incident and Butte Incident. Defendants Kelly and Fowler were on the Boards at the time of the Butte Incident. Defendant Williams has served the Utility since 2007, serving as the Utility's Senior Vice President, Energy Delivery from 2007 to 2011, the Utility's Executive Vice President, Electric Operations from 2011 to 2015, and as the Utility's President, Electric from 2015 to 2017. Therefore, Defendant Williams was associated with the Company as a senior executive before, during, and after all three Incidents.

306.     Further, both the Company's Chief Ethics and Compliance Officer and its Chief Safety Officer were regular attendees of the meetings of the Company' Boards, and would have updated the Boards on the Company's safety failures. These safety failures were well documented. The Company

maintains an award winning, state of the art database of information on each of its 2.4 million poles, to which Defendants Earley, Stavropoulos, Kane, Hogan, and, importantly, Williams, had access. Further, as alleged in a lawsuit regarding the Butte Incident, deposition testimony of Defendant Hogan and Dean McFarren, the Company's Quality Assurance Supervisor, demonstrates that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will be touching its powerlines."

307.    Safety is central to the Company's operations. As Defendant Williams herself stated on a conference call held with analysts and investors on July 27, 2017: "safety is at the heart of everything we do at PG&E." Indeed, the Company's safety failures have resulted in a potential liability of $17 billion as a result of the Wildfires, a figure in excess of 10 times the Company's average annual income.

308.    Therefore, Defendants Chew, Fowler, Kelly, Kimmel, Meserve, Miller, Mullins, Parra, Rambo, Smith, and Williams each knew of the falsity of the statements and misleading omissions detailed herein at the time such statements were made, and further failed to exercise or recklessly disregarded their duty of oversight to stop or correct such misleading statements and omissions.

309.    Additional reasons that demand on Defendant Williams is futile follow. Defendant Williams has served as a PG&E Director since May 2017 and has served as PG&E President and CEO since March 1, 2017. She has been a Director of the Utility since 2015. Prior to becoming PG&E's President and CEO, Defendant Williams served as the Utility's President, Electric from August 2015 to February 2017, as the Utility's Executive Vice President, Electric Operations from 2011 to 2015, and as the Utility's Senior Vice President, Electric Delivery from 2007 to 2011. Thus, as the Company admits, Defendant Williams is a non-independent director. She receives handsome compensation, including nearly $8.6 million in 2017. Her insider transaction before the fraud was exposed, which yielded approximately $823,635 in proceeds, demonstrates her motive in facilitating and participating

89

in the fraud. As a long-time senior executive of the Utility in positions focused on electricity operations and delivery, Defendant Williams would have been aware of the safety issues that were the subject of the false and misleading statements alleged herein at the time such statements were made. As a trusted Company director, President, and CEO, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Williams personally made many of the false statements and omissions of material fact that are alleged herein, including those made in conference calls. She also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Further, as Defendant Kane reported directly to Defendant Williams as part of her role as Chief Ethics and Compliance Officer, her knowledge can be imputed to Defendant Williams. For these reasons, too, Defendant Williams breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

310. Additional reasons that demand on Defendant Chew is futile follow. Defendant Chew has served as a Director of both PG&E and the Utility since 2009. Defendant Chew serves both Boards as Chair of the Audit Committees, and as a member of PG&E's Compliance Committee. He receives handsome compensation, including $293,630 in 2017. As a trusted Company director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Chew solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Chew

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

311.    Additional reasons that demand on Defendant Mullins is futile follow. Defendant Mullins has served as a Director of both PG&E and the Utility since 2016. Defendant Mullins serves both Boards as a member of Audit and Safety Committees. He receives handsome compensation, including $260,085 in 2017. As a trusted Company director and member of both Audit and Safety Committees, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Mullins solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Mullins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

312.    Additional reasons that demand on Defendant Meserve is futile follow. Defendant Meserve has been a Director of both PG&E and the Utility since 2006. Defendant Meserve serves both Boards as Chair of the Safety Committee, and as a member of PG&E's Compliance Committee. He receives handsome compensation, including $275,085 in 2017. As a long-time Company director, Chair of the Safety Committees, and member of the Compliance Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Meserve solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Meserve breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

313.    Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has been a Director of both PG&E and the Utility since 2015. Defendant Smith serves both Boards as a member of the Safety Committee, and as a member PG&E's Finance Committee and Compliance Committee. She receives handsome compensation, including $272,585 in 2017. As a trusted Company director and member of both Safety Committees, and PG&E's Compliance Committee, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Smith solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Smith breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

314.    Additional reasons that demand on Defendant Parra is futile follow. Defendant Parra has served as a Director of both PG&E and the Utility since 2009. Defendant Parra serves both Boards as a member of the Safety Committee. He receives handsome compensation, including $261,085 in 2017. As a trusted Company director and member of the Safety Committees, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Parra solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Parra breached his fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

315.    Additional reasons that demand on Defendant Kelly is futile follow. Defendant Kelly has served as a Director of both PG&E and the Utility since 2013 and as PG&E's non-executive chairman since December 2017, and is a member of the Audit Committee of both Boards. Between 2014 and 2017, he served on the Safety Committees of both PG&E and the Utility. He receives handsome compensation, including $284,752 in 2017. As a trusted Company director and member of the Audit Committees, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Kelly solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Kelly breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

316.    Additional reasons that demand on Defendant Fowler is futile follow. Defendant Fowler has served as a Director of both PG&E and the Utility since 2012. Defendant Fowler serves both Boards as a member of the Safety Committee and as a member of PG&E's Finance Committee. He receives handsome compensation, including $277,835 in 2017. As a trusted Company director and member of both Safety Committees, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Fowler solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons,

Defendant Fowler breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

317.   Additional reasons that demand on Defendant Kimmel is futile follow. Defendant Kimmel has served as a Director of both PG&E and the Utility since 2009. Defendant Kimmel serves PG&E's Board as the Chair of the Compliance Committee and a member of the Finance Committee. He receives handsome compensation, including $265,965 in 2017. As a trusted Company director and Chair of PG&E's Compliance Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Kimmel solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Kimmel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

318.   Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Director of both PG&E and the Utility since 2009. Defendant Miller serves both Boards as a member of the Audit Committee. He receives handsome compensation, including $318,904 in 2017. As a trusted Company director and member of the Audit Committees, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Miller solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

319.    Additional reasons that demand on Defendant Rambo is futile follow. Defendant Rambo has been a Director of both PG&E and the Utility since 2005. Defendant Rambo serves as Chair of PG&E's Finance Committee. She receives handsome compensation, including $270,085 in 2017. As a long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Rambo solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Further, the Finance Committee received a report in September 2007, at which time Defendant Rambo sat on the Finance Committee, warning the committee members that the Company had inadequate system safety controls, and that the Company "continues to experience potentially catastrophic equipment failures where the inability to analyze and trend historical patterns or to review the maintenance history of equipment has been identified as a contributing factor." Thus, Defendant Rambo has been aware of the safety issues affecting the Company's electricity transmission and distribution infrastructure for over a decade, including at the time that the false and misleading statements alleged herein were made. For these reasons, too, Defendant Rambo breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

320.    The Company has consistently represented that it has created a culture that encourages reporting of safety problems. For example, in an August 18, 2016 press release, the Company stated that "[t]he Corrective Action Program, a program that empowers employees at all levels of PG&E to speak up and identify issues that are in need of improvement." Further, as Defendant Earley stated in a November 4, 2016 conference call with analysts and investors:

> *We also wanted to make sure that every employee felt comfortable raising concerns, no matter how big or small, so we made a number of changes to encourage all employees to speak up when something doesn't seem right. For example, we worked with our unions to develop a non-punitive self-reporting policy.*

Verified Shareholder Derivative and Double Derivative Complaint

We've also adapted the nuclear industry's corrective action program across the Company, to make it easy for employees to report things that need to be fixed. ***In fact, employees can now report corrective action items through a simple app on their smart devices. And we've created a number of awards to publicly recognize employees when they do speak up, so that we are encouraging and reinforcing that behavior.***

(Emphasis added.) As a result of this robust reporting program, the Director-Defendants would have been aware of the persistent safety problems at the Company, including at the time that the false and misleading statements alleged herein were made. Thus, each of the Director-Defendants faces a substantial likelihood of liability, is not disinterested, and demand is excused.

321.   Defendants Chew, Kimmel, Meserve and Smith (the "Compliance Committee Defendants") served on the Company's Compliance Committee during the Relevant Period. Pursuant to the Compliance Committee Charter, Compliance Committee Defendants were and are responsible for, *inter alia*, reviewing periodic reports from management regarding compliance with laws, regulations, and internal policies and standards, and coordinating with the Safety Committee to discuss the Company's compliance program. As a result of their positions on the Compliance Committee, the Compliance Committee Defendants were well aware of the falsity of the statements alleged herein at the time that such statements were made, and therefore the Compliance Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

322.   Defendants Fowler, Kelly, Meserve, Mullins, Parra, and Smith (the "Safety Committee Defendants") served on  PG&E and the Utility's Safety Committees during the Relevant Period. Pursuant to the Safety Committee Charter, as members of PG&E's Safety Committee the Safety Committee Defendants were responsible for, *inter alia*, reviewing with management the principal risks related to or arising out of the Company's operations and facilities (including asset management programs of the Company's electric operations), reviewing the adequacy of the Company's corporate safety functions, and serving as a channel of communication between the Chief Safety Officer and the

Board. As a result of their positions on the Safety Committees, and particularly on PG&E's Safety Committee, the Safety Committee Defendants were well aware of the falsity of the statements alleged herein at the time that such statements were made, and therefore the Safety Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

323.    Defendants Chew, Kelly, and Mullins (the "Audit Committee Defendants") served on PG&E and the Utility's Audit Committees during the Relevant Period. Pursuant to the Audit Committee Charter, Audit Committee Defendants were responsible for reviewing and discussing with management and the independent auditors the Company's internal controls report, discussing with management the corporation's programs to monitor compliance with laws, regulations, and internal policies and standards and periodically receiving reports from the Compliance Committee with respect to compliance oversight and related matters. Further, as noted in the 2017 Proxy Statement, the Audit Committee is responsible for reviewing enterprise risks.  Based on these responsibilities, Audit Committee Defendants permitted and/or caused the Company to issue false and misleading statements as alleged herein. As a result of the Audit Committees' failures of management and oversight, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

324.    Defendants Fowler, Kimmel, Rambo, and Smith (the "Finance Committee Defendants") served on PG&E's Finance Committee during the Relevant Period. An action filed against the Company in connection with the Butte Incident has alleged that the Finance Committee actively was "involved in, and responsible for, assisting the Boards in their oversight of safety risk through its review of strategies to manage the largest individual risks identified in the enterprise risk management program," including "wildfire" risks. As a result of their positions on the Finance Committee, the Finance Committee Defendants were well aware of the falsity of the statements alleged

herein at the time that such statements were made, and therefore the Finance Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

325.   In violation of the Code of Conduct, Director-Defendant Williams conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Conduct, Director-Defendant Williams engaged in an insider sale of PG&E stock during the relevant period, failed to maintain the accuracy of Company records and reports, comply with laws and regulations, model compliance with the Code of Conduct, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, Director-Defendant Williams faces a substantial likelihood of liability and demand is futile as to her.

326.   In violation of the Director Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Director Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, and properly report violations of the Director Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

327.   The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for the Company any part

of the damages the Company suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

328.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

329.    The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

330.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of the Company. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of the Company, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

331.   If there is no directors' and officers' liability insurance, then the Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

332.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

333.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

334.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

335.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

336.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances

under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

337.    Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that: (1) the Company failed to comply with state safety requirements and regulations in maintaining its transmission and distribution networks; (2) as a result of the foregoing, the Company was in violation of such state laws and regulations; (3) the Company had made less progress on safety enhancements, and in particular, wildfire safety enhancements, than it had represented; (4) the Company's electricity transmission and distribution networks could foreseeably, and ultimately did, cause a number of wildfires in the State of California, due, at least in part, to the Company's failures of regulatory compliance; (5) as a result of the Company's safety issues, the Company's dividend was not as secure as the Individual Defendants had led the market to believe; (6) the Company failed to maintain internal controls; and (7) due to the foregoing, Defendants' statements regarding the Company's business, operations, regulatory compliance and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

338.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay for performance" elements while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

339.    The 2017 Proxy Statement also made reference to the Company's Code of Conduct and Director Code of Conduct. The Code of Conduct and Director Code of Conduct required the Company and Individual Defendants to abide by relevant laws and statutes, make accurate and non-misleading

public disclosures, deal fairly with the public, and not engage in insider trading. By issuing false and misleading statements to the investing public and through insider trading, the Individual Defendants violated the Code of Conduct. The 2017 Proxy Statement failed to disclose these violations and also failed to disclose that the terms of the Code of Conduct and Director Code of Conduct were being violated.

340.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including but not limited to, election of directors, ratification of an independent auditor, and the approval of officer compensation.

341.    The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendants Chew, Fowler, Kelly, Kimmel, Meserve, Miller, Mullins, Parra, Rambo, Smith, and Williams, which allowed them to continue breaching their fiduciary duties to PG&E.

342.    The Company was thus damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

343.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

**SECOND CLAIM**

**Against the Individual Defendants for Breach of Fiduciary Duties**

344.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

345.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

346.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

347.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

348.    In breach of their fiduciary duties owed to the Company, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company failed to comply with state safety requirements and regulations in maintaining its transmission and distribution networks; (2) as a result of the foregoing, the Company was in violation of such state laws and regulations; (3) the Company had made less progress on safety enhancements, and in particular, wildfire safety enhancements, than it had represented; (4) the Company did not double its typical vegetation management spending in 2016; (5) the Company's electricity transmission and distribution networks could foreseeably, and ultimately did, cause a number of wildfires in the State of California, due, at least in part, to the Company's failures of regulatory compliance; (6) as a result of the Company's safety issues, the Company's dividend was not as secure as the Individual Defendants had led the market to believe; (7) the Company failed to maintain internal controls; and (8) due to the foregoing, Defendants' statements regarding the Company's business, operations, regulatory compliance and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

349.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

350.   Additionally, while the Individual Defendants caused the Company's stock to be artificially inflated, five of the Individual Defendants benefitted themselves by engaging in lucrative insider sales on material inside information.

351.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

352.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and disguising insider transactions.

353.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and engaging in insider transactions. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

354.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

355.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, PG&E has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

356.    Plaintiff on behalf of the Company has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

357.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

358.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

359.    The Individual Defendants, based on improper conduct, received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of the Company, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

360.    Plaintiff, as a shareholder and a representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

361.    Plaintiff on behalf of PG&E has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of PG&E and the Utility, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to PG&E and the Utility;

(c)     Determining and awarding to the Company the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing the Company and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificates of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Boards' supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Boards;

2. a provision to permit the shareholders to nominate at least six candidates for election to each of the Boards; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding the Company restitution from each of the Individual Defendants;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

Dated: November 21, 2018                    Respectfully submitted,

                                            **THE BROWN LAW FIRM, P.C.**

                                            _____/s Robert C. Moest_____
                                            Robert C. Moest, Of Counsel, SBN 62166
                                            2530 Wilshire Boulevard, Second Floor
                                            Santa Monica, California 90403
                                            Telephone: (310) 915-6628
                                            Facsimile: (310) 915-9897
                                            Email: RMoest@aol.com

                                            **THE BROWN LAW FIRM, P.C.**
                                            Timothy W. Brown
                                            240 Townsend Square
                                            Oyster Bay, NY 11771
                                            Telephone: (516) 922-5427
                                            Facsimile: (516) 344-6204
                                            Email: tbrown@thebrownlawfirm.net

                                            *Counsel for Plaintiff*

Verified Shareholder Derivative and Double Derivative Complaint

<u>VERIFICATION</u>

I, Ron Williams  am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this   th day of November 2018.

11/15/2018 3:41:57 PM PST

DocuSigned by:

*Ron Williams*

219E1A674026464...

Ron Williams